Lisa NIIMI–MONTALBO, Plaintiff,

v.

Thomas E. WHITE, Defendant.

Civ. No. 00–00635 SOM/KSC.

United States District Court,
D. Hawai'i.

Jan. 15, 2003.

---

**1112**

William E.H. Tagupa, Douglas Thomas Moore, Honolulu, Hi, for Plaintiff.

Lisa Niimi–Montalbo, Wahiawa, HI, pro se.

R. Michael Burke, Honolulu, HI, for defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTIONS TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT.

MOLLWAY, District Judge.

### I. INTRODUCTION.

On December 15, 2000, Plaintiff Lisa Niimi–Montalbo ("Niimi–Montalbo"), a former United States Army ("Army") civilian employee, filed a nine-count First Amended Complaint, alleging that Defendant Thomas E. White ("White"), the Secretary of the Army, violated her constitutional and statutory rights in connection with her employment with and termination from the Army. She was removed from her Army position on April 1, 1999.

White has filed two motions to dismiss or, in the alternative, for summary judgment. The first motion seeks dismissal of or summary judgment on certain claims on "jurisdictional" grounds. That first motion is apparently unopposed except to the extent that it seeks affirmance of the Merit Systems Protection Board ("MSPB") decision with respect to Niimi–Montalbo's non-discrimination claims relating to her removal from employment. White's second motion seeks dismissal of or summary judgment on certain claims on "nonjurisdictional" grounds.[1]

---

1. The two motions, both filed on June 12, 2002, are titled (1) Motion to Dismiss or, in the Alternative, for Summary Judgment as to Subject–Matter Jurisdiction, and (2) Motion to Dismiss or, in the Alternative, for Summary Judgment Raising Non–Jurisdictional Issues. Both were filed after the motions cutoff.

White argues that, as subject matter jurisdiction may be raised at any time, the motions cutoff is a nullity as to the jurisdictional motion. But see Hill v. Blind Indus. & Servs. of Md., 179 F.3d 754, 757 (9th Cir.1999) (noting that the rule that lack of subject matter juris-

The court GRANTS in part and DENIES in part the motions for dismissal or summary judgment. The court dismisses Counts VII, VIII, and IX in their entirety, and dismisses Count IV to the extent that it alleges work-related injuries. The court grants summary judgment to White on Counts II, III, and VI in their entirety, and denies summary judgment to White on Count V in its entirety, and on Counts I and IV to the extent that those counts allege denial of reasonable accommodation of Niimi–Montalbo's alleged disability between March and May 1997.

## II. BACKGROUND FACTS.

The events at issue in this case occurred between February 1997 and April 1999.[2] At all relevant times until her Army employment ended, Niimi–Montalbo was employed in a position at level GS–06 at the Civilian Personnel Advisory Center ("CPAC") at the Fort Shafter Army base on Oahu. She was a personnel assistant who worked in "office automation." On February 1, 1997, she injured her back while lifting and carrying computer equipment at her job. She then stopped working, filed a Federal Employment Compensation Act ("FECA") claim with the Office of Workers Compensation Program ("OWCP") and received medical payments and Continuation of Pay.

Niimi–Montalbo returned to work in March 1997. Her treating physician, Dr. Thomas Sakoda ("Dr.Sakoda"), recommended that she be placed on light duty, part-time status. Although she was officially on light duty, part-time status, Niimi–Montalbo later claimed that she worked many overtime hours, and that her supervisor at CPAC, Jeffrey Okazaki ("Okazaki"), continued to demand that she produce as much as a full-time employee.

On May 16, 1997, Niimi–Montalbo reinjured herself at work. She stopped work again on May 18, 1997. She filed a recurrence-of-disability claim with OWCP and did not return to work until October 6, 1997.

On October 10, 1997, she filed an informal complaint with the Fort Shafter Equal Employment Opportunity ("EEO") Office, claiming discrimination on the basis of physical disability. In that EEO complaint, she alleged that, although she was formally on light duty, part-time status, from March to May 1997, Okazaki had "heaped" work on her after she had re-

---

diction may be raised at any time is "narrowly construed to conserve judicial resources and prevent untoward manipulation"). White then asserts that the nonjurisdictional motion should simply be accepted by the court. The procedure White followed is unacceptable. White should have filed a motion to extend the motions cutoff and made his arguments for late filing in that extension motion. That extension motion would have been decided by the Magistrate Judge. It was improper for White to ignore the cutoff and file the dispositive motions with offhand comments about how they should be allowed. However, the court accepts the substantive motions here given Niimi–Montalbo's lack of objection as to timing. Indeed, as Niimi–Montalbo, while proceeding *pro se,* asserted that she herself could not meet deadlines, she is hardly in a position to complain.

As discussed below, most of the grounds raised in White's motion as to "subject matter jurisdiction" are not, in fact, related to this court's subject matter jurisdiction. For example, failure to state a claim under Rule 12(b)(6) and failure to exhaust administrative remedies given the untimeliness of Niimi–Montalbo's communication with an Equal Employment Opportunity ("EEO") Counselor do not go to subject matter jurisdiction. The "subject matter jurisdiction" motion also seeks affirmance of the MSPB decision with respect to Niimi–Montalbo's nondiscrimination claims, again not a matter of subject matter jurisdiction.

2. The parties have stipulated to the authenticity of the exhibits.

turned to work in March 1997. She also alleged that Okazaki knew that she had worked until 3 a.m. on at least two occasions. She was first interviewed regarding that EEO complaint on November 12, 1997.

On Monday, November 17, 1997, Stephanie Chang ("Chang"), an employee in the Installation Safety Office at the Civilian Personnel Advisory Center ("CPAC"), allegedly learned that Niimi–Montalbo's OWCP files were missing from her desk and left her office to look for the files. Mirabelle Pagala ("Pagala"), another employee, allegedly told Chang that, on the previous Friday, Niimi–Montalbo had told Pagala that she had taken her OWCP files, and that Pagala had seen Niimi–Montalbo take the files out of the office that day. When Chang returned to the office, the files had allegedly been returned. After finding that the files had been returned to her office, Chang reported the incident to the Fort Shafter military police ("MP"). The MP investigation found that there was probable cause to believe that Niimi–Montalbo had had the missing files in her possession.

The Army's Criminal Investigation Command ("CID") investigated the matter and concluded that Niimi–Montalbo had falsified several United States Department of Labor Duty Status Reports ("Form CA–17s") by intentionally filling out the section of the Form CA–17s reserved for the supervisor's summary of the employee's duties, and that she had submitted the falsified Form CA–17s to the United States Department of Labor in support of her workers' compensation claim. Her workers' compensation claim was denied. The United States Attorney's Office declined to prosecute the case, as there had been no loss to the government.

Niimi–Montalbo denies that she falsified the Form CA–17s. She alleges in the Complaint filed with this court that it was Okazaki, not she, who falsified the claim forms. She has not, however, offered any evidence in support of her assertions.

On January 13, 1998, Niimi–Montalbo was examined by Dr. Ramon Bagby ("Dr.Bagby") in an independent OWCP examination. On January 14, 1998, Niimi–Montalbo told Dr. Sakoda that Dr. Bagby's examination had worsened her injury, and Dr. Sakoda deemed her totally disabled through February 23, 1998. As stated below, however, Niimi–Montalbo did not return to work in February 1998 or at any time before her termination in April 1999.

On February 5, 1998, Niimi–Montalbo filed her first formal EEO complaint with the Fort Shafter EEO Office, in which she alleged discrimination on the bases of sex, disability, and reprisal. Following an investigation, which included a Fact Finding Conference at which a number of witnesses, including Niimi–Montalbo, testified under oath, the Office of Complaint Investigations ("OCI") concluded that Niimi–Montalbo had failed to demonstrate that her sex, disability, or filing of EEO complaints had motivated any of the challenged conduct by her supervisors. The OCI recommended a finding of no discrimination on September 29, 1998. At Niimi–Montalbo's request, an Equal Employment Opportunity Commission ("EEOC") Administrative Judge was appointed in her case on December 17, 1998.

Dr. Sakoda referred Niimi–Montalbo to Dr. William Quigley ("Dr.Quigley"), a psychologist, who began treating her on January 30, 1998. On February 20, 1998, Dr. Quigley opined to Dr. Sakoda that Niimi–Montalbo should not return to the "work environment" she had left, and that she should be placed elsewhere. On or around March 2, 1998, Niimi–Montalbo requested clearance to begin work in another office. Dr. Sakoda recommended the transfer. On March 3, 1998, Niimi–Montalbo told

Dr. Sakoda that Okazaki would not release her to work in another office, and that she had decided not to return to work because of the stress caused by the work environment in her current position.

On March 2, 1998, Niimi–Montalbo filed a recurrence-of-injury claim with OWCP, claiming that Dr. Bagby's examination had exacerbated her injury. OWCP denied that claim on June 24, 1998. Niimi–Montalbo requested reconsideration, and the denial of her claim was sustained.

On April 30, 1998, and August 18, 1998, Niimi–Montalbo wrote letters to her Congresswoman in which she complained about alleged discrimination at her job. Niimi–Montalbo's letter of April 30, 1998, also refers to an earlier letter allegedly sent to the Congresswoman on March 17, 1998.

In a letter dated November 11, 1998, Dr. Quigley stated that Niimi–Montalbo's "psychiatric disability .... limited her functional capacity in a major life activity essential to her employment." Dr. Quigley wrote: "The specific activity which is impaired by this condition is her ability to perform a broad range of jobs within the workplace environment to which she is currently assigned and under the specific administration and supervision of this workplace setting."

On November 19, 1998, Okazaki wrote a letter to Niimi–Montalbo informing her that he considered her absences from work to be "beyond a reasonable period of time for an employer to be expected to hold a position open for an employee who is incapacitated due to a job related illness or injury." He stated, "Unless you can make yourself ready, willing and able to report for duty in your assigned position on a regular, full-time basis and perform the

normal duties of your position on or before 20 Nov 98, action to ... remove you from your position may be taken." That date was later extended to December 4, 1998. Niimi–Montalbo did not return to work as requested.

Niimi–Montalbo filed a second formal EEO complaint, alleging discrimination on the bases of gender and disability, and also alleging reprisal, on December 24, 1998. That complaint was received by the Fort Shafter EEO Office on January 5, 1999. The OCI investigator conducted a Fact Finding Conference on September 29, 1999, and recommended a finding of no discrimination on December 7, 1999.

Niimi–Montalbo requested leave pursuant to the Family and Medical Leave Act ("FMLA") on January 9, 1999.

According to White, Okazaki issued a proposed notice of removal on February 8, 1999.[3] On April 1, 1999, Bryson Jhung, the deciding official, notified Niimi–Montalbo of her removal, effective April 10, 1999.

Niimi–Montalbo appealed her removal to the MSPB, which affirmed the removal decision on July 27, 2000. The MPSB decision included rulings that Niimi–Montalbo was not qualified for leave under the FMLA and that Niimi–Montalbo could not show that she had engaged in protected disclosures under the Whistleblower Protection Act of 1989.

Count I alleges that Niimi–Montalbo was denied accommodation for a disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–13, and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §§ 701–96i. Count I further alleges that the "removal

---

**3.** The date of the notice of proposed removal is not clear on the copy of the notice filed with the court; however, Niimi–Montalbo does not dispute that the notice of proposed removal was filed on February 8, 1999.

of Plaintiff from her position was a pretext for discrimination."

Counts II and III allege that White violated 5 U.S.C. §§ 2302(b)(8) and (9) by improperly retaliating against Niimi–Montalbo for filing EEO complaints, for filing grievances and work-related injury claims, and for whistleblowing activities.

Count IV alleges that White improperly considered Niimi–Montalbo's absences from work arising from work-related injuries in the decision to terminate her employment. Count IV also appears to allege that Dr. Bagby's examination injured Niimi–Montalbo.

Count V alleges that White violated the FMLA by removing Niimi–Montalbo from her position when she was entitled to family medical leave.

Count VI alleges that White is liable for improper assistance in meritless investigations of Niimi–Montalbo's worker's compensation claims in retaliation for her filing EEO complaints, for filing grievances and work-related injury claims, and for whistleblowing activities.

Count VII alleges that White is liable for the falsification of Niimi–Montalbo's worker's compensation claim forms and failure to ensure the processing of those claims.

Count VIII alleges that Niimi–Montalbo's Equal Protection and Due Process rights were violated when White failed to accommodate her disabilities, failed to process her worker's compensation claims, investigated her without cause, retaliated against her for having filed EEO and whistleblowing claims, and terminated her employment while she was on approved leave status.

Count IX alleges that the meritless criminal accusations and investigations injured Niimi–Montalbo's reputation in the community and caused her humiliation and embarrassment.

## III. STANDARD OF REVIEW.

### A. Standard for Dismissal.

Rule 12(b)(6) permits dismissal upon the "failure to state a claim upon which relief can be granted." On a motion to dismiss pursuant to Rule 12(b)(6), review is limited to the contents of the complaint, and all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. See Fed'n of African Am. Contractors v. City of Oakland, 96 F.3d 1204, 1207 (9th Cir.1996) (citations omitted). "On a motion to dismiss, material allegations of the complaint are taken as admitted, and the complaint is to be liberally construed in favor of the plaintiff." Kennedy v. H & M Landing, Inc., 529 F.2d 987, 989 (9th Cir.1976).

### B. Summary Judgment Standard.

Summary judgment shall be granted when:

> the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); see also Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir.2000). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. See id. at 323, 106 S.Ct. 2548. A moving party without the ultimate burden of persuasion at trial—usually, but not always, the defendant—has both the initial burden of production and

the ultimate burden of persuasion on a motion for summary judgment. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.,* 210 F.3d 1099, 1102 (9th Cir.2000).

All evidence and inferences must be construed in the light most favorable to the nonmoving party. *T.W. Elec. Service, Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 631 (9th Cir.1987). Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. *Id.* When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *Id.*

## IV. *ANALYSIS.*

As detailed below, the court dismisses or grants summary judgment on all of Niimi–Montalbo's claims except for Counts I and IV of the Complaint with respect to the period from February 1998 to April 1999.

### A. *The Complaint Does Not Allege Discrimination on the Basis of Sex.*

The court reads the complaint as alleging discrimination on the basis of disability only, and not discrimination on the basis of sex. Niimi–Montalbo's first formal EEO complaint, filed February 5, 1998, alleged discrimination on the basis of sex, as did her second formal EEO complaint, filed January 5, 1999. The Complaint filed with this court, however, does not allege any facts supporting a claim of discrimination on the basis of sex. Rather, Niimi–Montalbo's claims of discrimination and retaliation are based entirely on events arising from and related to her work-related injuries and to what she says were the resulting physical and mental disabilities. The Complaint makes no mention of sex discrimination; nor does her opposition to the present motions refer to sex discrimination.

The court notes that, if Niimi–Montalbo is seeking to assert a claim of discrimination on the basis of sex, her claims must be dismissed. To prevail under Title VII, Niimi–Montalbo must first make out a prima facie case of discrimination. She may establish a prima facie case by showing that: (1) she belongs to a protected class (in this case, the class of women); (2) she was performing according to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) other employees with qualifications similar to her own were treated more favorably. *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1220 (9th Cir.1998) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

Niimi–Montalbo fails to make out a prima facie case of sex discrimination. Niimi–Montalbo does not assert or show that male employees were treated more favorably. In her Complaint, she states only that she was discriminated against on the basis of her alleged disability.

### B. *Counts VII and VIII, Which Allege Separate Constitutional Claims, Are Dismissed for Failure to State a Claim.*

Counts VII and VIII allege violations of the Equal Protection and Due Process clauses arising from (1) the processing of Niimi–Montalbo's workers' compensation claims; (2) the alleged failure to accommodate her disabilities; (3) the alleged retaliation for her filing of EEO complaints and for her "whistleblowing"; and (4) her removal from employment, allegedly on the basis of her absence from work as a result of her disability.

White argues that Counts VII and VIII should be dismissed because Title VII and

the Rehabilitation Act preclude separate constitutional claims. Niimi–Montalbo does not oppose the dismissal of Counts VII and VIII on those grounds.

■ Title VII and the Rehabilitation Act provide the exclusive judicial remedies for the claims of employment discrimination and retaliation alleged in Counts VII and VIII. *See Brown v. General Services Administration,* 425 U.S. 820, 835, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) (holding that Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment"); *Boyd v. U.S. Postal Serv.,* 752 F.2d 410, 413 (9th Cir.1985) (citing *Brown* ); *White v. General Servs. Admin.,* 652 F.2d 913, 917 (9th Cir.1981) (holding that Title VII is the exclusive judicial remedy for filing an EEO complaint).

■ Moreover, to the extent that Counts VII and VIII allege nondiscriminatory constitutional violations, the Civil Service Reform Act ("CSRA") provides the exclusive remedy for federal employees alleging adverse personnel actions in violation of their constitutional rights. The CSRA's comprehensive statutory scheme precludes a separate constitutional claim arising from alleged prohibited personnel practices, including personnel actions that violate the employee's constitutional rights. 5 U.S.C. §§ 2301(b)(2), 2302(b)(11); *Saul v. United States,* 928 F.2d 829 (9th Cir. 1991).

Accordingly, Niimi–Montalbo may not pursue the separate constitutional claims alleged in Counts VII and VIII.

C. · *Count IX Is Dismissed for Failure to State a Claim; Count IV Is Dismissed to the Extent That It Alleges Injury by Dr. Bagby.*

Count IX seeks damages for humiliation, embarrassment, and injury to Niimi–Montalbo's reputation as a result of "meritless criminal accusations and investigations." This claim apparently arises from the investigations of the allegedly missing OWCP files.

Count IV alleges, in part, that Dr. Bagby's examination resulted in injury to Niimi–Montalbo.

White argues for dismissal of Count IX on the ground that it is precluded by the CSRA and the Federal Employees Compensation Act (FECA). Niimi–Montalbo does not oppose the dismissal of Count IX.

As discussed above, to the extent that Count IX alleges a separate constitutional violation, it is precluded by the CSRA.

■ To the extent that Count IX alleges a job-related injury, FECA provides the exclusive remedies for job-related injury or death. 5 U.S.C. § 8116(c). If there is a question as to whether FECA covers a certain type of injury, the Secretary of Labor should resolve the question as long as the claim is "colorably under FECA." *Figueroa v. United States,* 7 F.3d 1405, 1407–08 (9th Cir.1993). Emotional distress related to one's job arguably falls under FECA. *See id.* at 1408. Even if, however, a remedy were available under the Federal Tort Claims Act ("FTCA"), Count IX would still be dismissed because Niimi–Montalbo failed to file a timely administrative claim, which is a jurisdictional prerequisite to filing suit under the FTCA. 28 U.S.C. § 2675(a); *Goodman v. United States,* 298 F.3d 1048, 1054–55 (9th Cir. 2002); *Caton v. United States,* 495 F.2d 635, 637 (9th Cir.1974).

Similarly, Count IV is precluded to the extent that it alleges a work-related injury incurred during Dr. Bagby's examination.

D. *Pursuant to the Court's Review of the MSPB Decision as to the Non-discrimination Claims, Summary Judgment Is Denied on Count V and Granted on Counts III and on the Portion of Count VI Alleging Nondiscrimination Claims.*

Count III alleges that White retaliated against Niimi–Montalbo for filing grievances and work-related injury claims, and for whistleblowing activities. Count V alleges that White violated Niimi–Montalbo's FMLA rights by removing her from employment. Count VI alleges that the CID investigation of Niimi–Montalbo was in retaliation for her having filed EEO complaints, grievances, and work-related injury claims, and for whistleblowing activities. The filing of EEO complaints constitutes protected activity under Title VII and is addressed in a later section of this order; this section addresses only Niimi–Montalbo's claims of retaliation as to her other allegedly protected activities.

The MSPB was created by the CSRA. Federal employees may appeal removals and other "adverse actions" to the MSPB. 5 U.S.C. §§ 7512–7513. The MSPB "also has pendent jurisdiction over discrimination claims brought in connection with an 'adverse action' otherwise appealable to it." *Sloan v. West*, 140 F.3d 1255, 1259 (9th Cir.1998) (citing 29 C.F.R. 1614.302 (1997)). If the MSPB has determined that it has jurisdiction over a "mixed" case, i.e., a case that presents both discrimination and nondiscrimination claims, then the MSPB decision is appealable to the federal district court. *Id.* at 1260 (citing 29 C.F.R. § 1614.310(b) (1997)). *See also id.* at 1258–61 (providing more detailed description of MSPB appeal procedure).

This court's review of the MSPB decision on nondiscrimination claims is deferential. Under 5 U.S.C. § 7703, this court may set aside the decision of the MSPB on nondiscrimination claims only to the extent that, upon a review of the record, the court finds any agency action, finding, or conclusion to be: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). This court reviews *de novo* any claims of discrimination. 5 U.S.C. § 7702(e)(3).

In his motions, White argues that the MSPB decision should be affirmed on all nondiscrimination claims. Niimi–Montalbo challenges the MSPB decision only with respect to its determination that she did not qualify for leave under the FMLA.

The FMLA grants private and federal employees the right to at least twelve weeks of unpaid leave in any twelve-month period for "(1) the treatment of a serious, disabling health condition suffered by the employee, (2) the birth of a child, or (3) the care of a child, spouse, or parent who suffers from a serious health condition." *Funkhouser v. Wells Fargo Bank, N.A.*, 289 F.3d 1137, 1140 (9th Cir.2002) (citing 29 U.S.C. § 2612(a), which mirrors 5 U.S.C. § 6382(a)). Employees are "guaranteed reinstatement after exercising their leave rights." *Bailey v. Southwest Gas Co.*, 275 F.3d 1181, 1185 (9th Cir.2002). Leave for federal civil service employees with more than twelve months of civil service is governed by Title II of the FMLA; Title I governs leave for private employees and federal employees not covered by Title II. *Russell v. U.S. Dep't of the Army*, 191 F.3d 1016, 1018 (9th Cir.1999). To qualify for leave under Title I of the FMLA, an employee must have completed at least 1,250 hours of service during the previous twelve-month period.

It is undisputed that Niimi–Montalbo was a Title II employee at the time she

requested FMLA leave in January 1999.[4] The MSPB, however, erred by applying the Title I requirement, ruling that Niimi–Montalbo did not qualify for FMLA leave because she had completed less than 1,250 hours of service in the previous twelve-month period as required.

■ There is a genuine issue of fact as to whether the government violated Niimi–Montalbo's rights under the FMLA because it is unclear whether, at the time she requested FMLA leave, she was entitled to leave under Title II of the FMLA. Before subtracting leave from an employee's twelve-week entitlement, the agency must first "obtain[ ] confirmation from the employee of his or her intent to invoke entitlement to [FMLA] leave." 5 C.F.R. § 630.1203(h). There is no evidence in the record that the Army obtained confirmation from Niimi–Montalbo regarding her intent to invoke her entitlement to FMLA leave. As discussed below, Niimi–Montalbo's eleven-month absence from work just prior to her request for FMLA leave does not necessarily constitute an independent justification for her removal in April 1999 because, on the present record, there are genuine issues of fact as to whether she is disabled and whether the government provided reasonable accommodation for her disability. Accordingly, White's motion for dismissal or summary judgment is denied as to Count V of the Complaint.

As noted above, Niimi–Montalbo does not oppose affirmance on the other nondiscrimination claims in the MSPB decision. Therefore, this court affirms the MSPB decision with respect to Niimi–Montalbo's claims of retaliation for whistleblowing and filing of other grievances. Summary judgment is granted on Count III of the Complaint and the portion of Count VI alleging retaliation for having filed grievances and work-related injury claims, and for whistleblowing activities.

E. *Summary Judgment Is Granted on Counts I and IV to the Extent That Niimi–Montalbo Alleges Denial of Reasonable Accommodation Between March and May 1997.*

Count I alleges that Niimi–Montalbo was denied reasonable accommodations in violation of the Rehabilitation Act.[5] Count IV alleges that Niimi–Montalbo was absent from work for work-related and non-work-related injuries, and that those absences were improperly considered in the decision to remove her from employment.

■ The Rehabilitation Act requires that the federal employee alleging discrimination exhaust her administrative remedies before filing suit. *Boyd v. U.S. Postal Serv.*, 752 F.2d 410, 412–13 (9th Cir.1985). When a federal employee alleges denial of reasonable accommodations, she must contact an EEO Counselor within forty-five days of the alleged discriminatory conduct.

---

**4.** In his reply, White argues that, under *Russell*, this court lacks jurisdiction over Niimi–Montalbo's FMLA claim because Title II does not provide a private right of action for employees alleging violations of their rights under the FMLA. *Russell*, 191 F.3d at 1018–19. Because, however, the FMLA claim comes to this court through the procedures set forth in the CSRA, i.e., as an appeal from a decision by the MSPB, the court has jurisdiction over Niimi–Montalbo's FMLA claim. *See id.* at 1019 (stating that judicial review of claims

under Title II of the FMLA is permitted under the CSRA).

**5.** Count I also alleges that White violated the ADA by failing to make reasonable accommodation to Montalbo. The ADA does not apply to federal executive agencies, but the standards for determining whether a violation of section 501 of the Rehabilitation Act has occurred are the same standards applied under Title I of the ADA and sections 501 through 504, and 510, of the ADA, as such sections relate to employment. 29 U.S.C. § 791(g).

29 C.F.R. § 1614.105(a)(1). The timely filing of an EEOC charge is not a jurisdictional prerequisite to suit. *Zipes v. Trans World Airlines,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *Boyd,* 752 F.2d at 414. Rather, we "treat the [forty-five-day] time limit as a statute of limitations, and it is subject to waiver, estoppel, and equitable tolling." *Boyd,* 752 F.2d at 414. The forty-five-day period may be extended if, for instance, the employee was not aware of the time limits, or did not know and should not have known of the discriminatory conduct. 29 C.F.R. § 1614.105(a)(2).

■ The government argues that summary judgment should be granted on Niimi–Montalbo's claim that she was denied reasonable accommodation for her physical disabilities between March and May 1997 because she did not comply with the forty-five-day time limit in 29 C.F.R. § 1614.105(a). Niimi–Montalbo apparently does not oppose summary judgment on this claim.

Niimi–Montalbo has not claimed that she contacted an EEO Counselor within forty-five days of the allegedly discriminatory conduct that occurred between her return to work in March 1997, and May 18, 1997, the day she again stopped work because she had allegedly aggravated her injury on May 16, 1997. Her first EEO complaint, in which she alleged that Okazaki had failed to provide reasonable accommodations from March to May 1997, was filed on October 10, 1997, almost five months after she had stopped work. Nor does she claim, either in the Complaint filed in this court or in her opposition to White's motions, that there is any legitimate reason she failed to exhaust her administrative remedies with respect to her claim that she was denied reasonable accommodations or a reassignment or transfer in violation of the Rehabilitation Act. Therefore, summary judgment is granted on Counts I and IV to the extent that Niimi–Montalbo alleges a denial of reasonable accommodation between March and May 18, 1997.

F. *Summary Judgment Is Denied on Counts I and IV With Respect to Claims of Discrimination Arising from Niimi–Montalbo's Alleged Mental Disability.*

Although this court grants summary judgment on the portions of Counts I and IV seeking remedies in connection with an alleged denial of reasonable accommodation between March and May 18, 1997, summary judgment is precluded on the remaining portions of Counts I and IV. Those remaining portions allege a mental disability suffered after the period addressed in the preceding section of this order.

Section 501 of the Rehabilitation Act, 29 U.S.C. § 791, which prohibits federal agencies from discriminating against employees on the basis of disability, is the "exclusive remedy for discrimination in employment [by a federal agency] on the basis of handicap." *Boyd,* 752 F.2d at 412. Under the Rehabilitation Act, the federal government "shall be a model employer of individuals with disabilities." 29 C.F.R. § 1614.203(a). Because Niimi–Montalbo's Complaint in the present case alleges "nonaffirmative action employment discrimination," the standards for determining whether a violation of section 501 has occurred are the same standards applied under Titles I and IV of the ADA insofar as such sections relate to employment. 29 U.S.C. § 791(g); 29 C.F.R. § 1614.203(b).

■ The Rehabilitation Act, like the ADA, proscribes discrimination against a qualified individual with a disability because of the disability in regard to the terms, conditions, and privileges of employment. *See* 42 U.S.C. § 12112(a). To

prevail on the remaining claims arising from her alleged disability, Niimi–Montalbo must establish that she (1) was a disabled person within the meaning of the ADA and the Rehabilitation Act, (2) was able to perform the essential functions of the job with or without reasonable accommodation, and (3) was fired because of her disability. *See Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 271 (9th Cir.1996).

To have a disability, Niimi–Montalbo must have "a physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2)(A) (1995). An individual is also disabled if she has a record of having such an impairment or is regarded as having such an impairment. 42 U.S.C. §§ 12102(2)(B), (C) (1995).

██ For disability purposes, a limitation "must be severe or, in other words, substantial when compared to the ability of 'the average person in the general population.'" *McAlindin v. County of San Diego*, 192 F.3d 1226, 1235 (9th Cir.1999), *amended by* 201 F.3d 1211 (2000) (quoting 29 C.F.R. § 1630.2(j)(1)(i)). The court considers the nature and severity of the impairment, its duration, and its long-term impact. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 690, 151 L.Ed.2d 615 (2002); 29 C.F.R. § 1630.2(j)(2) (2002). A medical diagnosis of impairment is not enough. Instead, Niimi–Montalbo must show "that the extent of the limitation [caused by her impairment] in terms of [her] own experience ... is substantial." *Toyota Motor*, 122 S.Ct. at 691–92 (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567, 119 S.Ct.

2162, 144 L.Ed.2d 518 (1999)) (alterations in *Toyota Motor*). The existence of a disability is to be determined on a case-by-case basis. *Toyota Motor*, 122 S.Ct. at 692.

### 1. Niimi–Montalbo Was Not Substantially Limited in Working.

██ Assuming that working is a "major life activity,"[6] a finding of "substantial limitation" for disability purposes requires that Niimi–Montalbo be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 523, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999); 29 C.F.R. § 1630.2(j)(3)(i). The evidence, however, shows that Niimi–Montalbo would have been able to return to work had she been transferred to a different workplace, with a different supervisor and different co-workers. In alleging that she was denied accommodation, Niimi–Montalbo admits that a "reassignment" or "transfer" to a different workplace would have allowed her to return to work. The medical and psychological reports on which Niimi–Montalbo relies state that her impairment was related to the specific people and environment at her workplace, and that a transfer to another workplace would have permitted her to return to work.

Thus, Dr. Sakoda's records show that, in early March 1997, Niimi–Montalbo was ready and willing to return to work in another office, but did not return when she was denied a transfer because the environ-

---

**6.** The EEOC considers working to be a major life activity. 29 C.F.R. § 1630.2(i). However, the Supreme Court has questioned the inclusion of working as a major life activity on the ground of circularity. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). In *Sut-*

*ton*, the Court assumed, without deciding, that working was a major life activity. *See id.* The Ninth Circuit has made the same assumption. *See Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 795 n. 1 (9th Cir.2001), *clarified by* 292 F.3d 1045 (2002).

ment of her current assignment was "the source for the stress." Sakoda Notes (3/3/98) (Def.Ex.7). Dr. Quigley stated that Niimi–Montalbo's mental impairment limited "her ability to perform a broad range of jobs *within the workplace environment to which she is currently assigned* and *under the specific administration and supervision of this workplace setting.*" Letter from Quigley to Moore of 11/11/98 (emphasis added). This court has found no legal authority suggesting that the "class" concept contained in the EEOC regulations with respect to working extends to a class of jobs in a particular environment. Rather, the "class of jobs" analysis in *Toyota Motor* focuses on the nature and requirements of jobs at issue, not on the particular people with whom the claimant works or the "environment" of the particular workplace. The court therefore concludes on the present record that Niimi–Montalbo was not substantially limited with respect to working.

2. *There Is a Genuine Issue of Material Fact as to Whether Niimi–Montalbo Was Substantially Limited in Her Ability to Interact With Others.*

There is a genuine issue of fact as to whether Niimi–Montalbo had a physical and mental impairment that substantially limited her ability to "interact with others." Interacting with others is a major life activity. *McAlindin,* 192 F.3d at 1234. To show that she was substantially limited in her ability to interact with others, Niimi–Montalbo must show that "relations with others were characterized on a regu-

lar basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary." *Id.* at 1235. "Mere trouble getting along with coworkers is not sufficient to show a substantial limitation." *Id.*

In determining whether an impairment rises to the level of a disability, the court looks to the effect of the impairment both inside and outside of the workplace. *See Toyota Motor,* 122 S.Ct. at 693. The record indicates that Niimi–Montalbo may have experienced "severe problems" in her ability to interact with Okazaki and her coworkers at her particular workplace. At the EEO Fact Finding Conference on September 29, 1999, Niimi–Montalbo testified that she suffered from stress, anxiety attacks, and paranoia because of her job, and that these problems were so severe that she became dependent on prescription drugs. She testified that these problems also affected her life outside the workplace: "I'm so paranoid, and I have this anxiety problem, that I literally shut myself away.... I lock myself in my room at home." She further testified that she was unable to communicate with her friends and her children: "I wouldn't talk to people. I didn't even call my friends. I didn't talk to my kids." Dr. Quigley opined numerous times that Niimi–Montalbo had serious psychological problems that substantially limited her ability to interact with Okazaki and her coworkers.[7]

The court acknowledges, however, that the question of whether Niimi–Montalbo

---

7. The government asserts, correctly, that Niimi–Montalbo would not be disabled under the Rehabilitation Act if her alleged disability consisted only of stress related to her particular job, which would be alleviated if she were reassigned or transferred. As noted above, Niimi–Montalbo was clearly not substantially limited from working, assuming that working is a major life activity. However, she has

offered some evidence that she was substantially limited in the major life activity of interacting with others both inside and outside the workplace. Even if her alleged impairment was caused by or exacerbated by a particular workplace environment, that would not preclude that impairment from constituting a disability under the Rehabilitation Act.

**1124**

was disabled is a close one. Other than Niimi–Montalbo's September 1999 testimony regarding her interactions with her children and other people, there is not much in the present record that tends to establish a disability. For instance, much of the documentation provided to the government by Niimi–Montalbo's lawyer and psychologist omits specific details about the nature of Niimi–Montalbo's alleged disability, suggesting only that her alleged disability is caused by her particular workplace environment and limits only her ability to work in that one environment. Because, however, Niimi–Montalbo has presented some evidence that she may have been substantially limited in her ability to interact with others, this court concludes, on the present record, that there is a question of fact as to whether she was disabled.

3. *There Is a Genuine Issue of Material Fact as to Whether Niimi–Montalbo Was a "Qualified" Individual.*

The government argues that Niimi–Montalbo, regardless of her alleged disability, was not a "qualified" individual. An individual is qualified under the ADA if she can perform the essential functions of her employment "with or without reasonable accommodation."

The government argues that Niimi–Montalbo was unable to come to work, and that coming to work was an essential function of her job. As noted below, however, there is a genuine issue of material fact as to whether or not working from home would have been a reasonable accommodation. Moreover, it is undisputed that Niimi–Montalbo would have been able to come to work had she been assigned to a different workplace. A "qualified individual with a disability" includes an individual "who could perform the essential functions of a reassignment position, with or without reasonable accommodation." *Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1111 (9th Cir.2000) (en banc), *vacated in part on other grounds,* 535 U.S. 391, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002).

4. *If Niimi–Montalbo Is a Qualified Individual with a Disability, There Is a Genuine Issue of Material Fact as to Whether Her Employer Reasonably Accommodated Her.*

The government argues that, even if Niimi–Montalbo is a qualified person with a disability within the meaning of the Rehabilitation Act, summary judgment should be granted because the government reasonably accommodated her as required by law. Under *Barnett,* 228 F.3d at 1114, an employer has a mandatory obligation to engage in an interactive process to identify possible reasonable accommodations. The interactive process is "triggered by an employee or an employee's representative giving notice of the employee's disability and the desire for accommodation." *Id.* at 1114. The government "cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the [government] engaged in good faith in the interactive process." *Id.* at 1116.

First, there is a genuine issue of fact as to whether the interactive process was triggered even if Niimi–Montalbo was in fact disabled.[8] While it is clear that Niimi–Montalbo claimed that she had a disability and requested accommodation in the form of a reassignment or transfer, it

8. *Barnett* does not address the respective burdens of the employer and employee as to the establishment of a disability because the analysis assumes that Barnett, the complainant in that case, was disabled. *See Barnett,* 228 F.3d at 1110 n. 1. *But see id.* at 1123–25 (O'Scannlain, J., dissenting) (arguing that the court should have affirmed the district court's summary judgment based on Barnett's failure to establish that he is disabled).

is not clear on the present record that the government knew or had reason to know that her alleged disability was in fact a disability. As mentioned above, the correspondence between Niimi–Montalbo's lawyer and the government, and the certifying documents and letters provided by Dr. Quigley and Dr. Sakoda, focus primarily on Niimi–Montalbo's inability to return to work at her specific workplace and do not mention her alleged inability to interact with others outside that particular workplace.[9] Nevertheless, the government may have had reason to believe that Niimi–Montalbo was suffering from more severe problems. On the present record, assuming that Niimi–Montalbo was disabled, it is unclear whether the government's duty to accommodate was triggered.

Second, assuming that the government's obligation to engage in the interactive process was triggered, there is a genuine issue of material fact as to whether the government met its burden under *Barnett* with respect to the interactive process. The present record is not clear as to whether allowing Niimi–Montalbo to work from home would have been a reasonable accommodation. The government contends that her position required attendance at work at least part-time, but, as Niimi–Montalbo did do some of her work from home between March and May 1997, the record is not conclusive as to whether working from home would have imposed undue hardship on the government.

With respect to Niimi–Montalbo's request for reassignment, the government has established that it did make some attempts to find vacant positions at Niimi–Montalbo's level (i.e., the GS–06 level), but found none. However, the government concedes that, although it was aware that there were multiple openings at the GS–05 level at alternate workplaces, it did not discuss with Niimi–Montalbo the possibility of her taking those positions.

There is evidence that Okazaki and Jhung were reluctant to set a precedent whereby any employee who was unhappy in her current position would be able to claim a disability and be reassigned. If Niimi–Montalbo were actually disabled, then statements of such reluctance by decisionmaking officials could be evidence that the government did not engage in the interactive process in good faith. Accordingly, summary judgment is denied as to Counts I and IV to the extent that they allege discrimination with respect to Niimi–Montalbo's alleged mental disability.

G. *Summary Judgment Is Granted on the Title VII Retaliation Claims (Count II and the Remaining Portion of Count VI).*

Count II alleges that Niimi–Montalbo was retaliated against because she filed EEO complaints. Count VI alleges, in part, that the MP and CID investigations, as well as an "investigation … with the U.S. Attorney's Office," were also conducted in retaliation for her filing of EEO complaints.

Title VII provides that an employer may not "discriminate against any of his employees or applicants for employment … because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceed-

---

9. For example, Dr. Quigley's letter to Douglas Moore, dated February 11, 1999, certified that Niimi–Montalbo was "totally disabled from any and all job functions, duties, physical or otherwise, and duty location assign-ment with her current employer of record, the [CPAC] and … Okazaki, due to excessive personal and professional conflict." (Def.'s Ex. 46).

ing, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

■ To make out a prima facie case of retaliation, Niimi–Montalbo must show that (1) she engaged in a protected activity; (2) she was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *Ray v. Henderson,* 217 F.3d 1234, 1240 (9th Cir.2000). The burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for his decision, and the plaintiff bears the ultimate burden of demonstrating that the reason given was "merely a pretext for a discriminatory motive." *Id.*

The only "protected activity" under Title VII that Niimi–Montalbo engaged in was filing EEO complaints.

The Ninth Circuit takes a relatively broad view of what constitutes an adverse employment action. An action is cognizable as an adverse employment action for purposes of a retaliation claim "if it is reasonably likely to deter employees from engaging in protected activity." [10] *Id.* at 1243. Examples of adverse employment actions include reductions in pay and decreases in an employee's ability to influence workplace policy. *Id.* at 1244. An adverse employment action does not, however, include "every offensive utterance by co-workers, because offensive statements by co-workers do not reasonably deter em-

ployees from engaging in protected activity." *Id.* at 1243.

Niimi–Montalbo alleges five different adverse employment actions: (1) the CID investigation [11] of her alleged removal of OWCP files and her alleged falsification of the Form CA–17s; (2) a hostile work environment created by the CID investigation; (3) Okazaki's November 1998 warning to her that he would recommend her removal if she did not return to work; (4) the February 1999 notice of proposed removal signed by Okazaki; and (5) Niimi–Montalbo's removal from employment in April 1999. In response, the government argues that only Niimi–Montalbo's removal from employment constitutes an adverse employment action.

For the reasons discussed below, summary judgment is granted to White with respect to each of these alleged adverse employment actions.

### 1. The CID Investigation.

■ Niimi–Montalbo has not clearly established a prima facie case with respect to the CID investigation. First, it is not clear that the CID investigation was an adverse employment action. The CID investigation did not affect Niimi–Montalbo's employment per se. More importantly, Niimi–Montalbo has not shown that the investigation was objectively adverse, i.e., that a "reasonable person in the same

---

**10.** The Ninth Circuit has explicitly rejected the position of the Fifth and Eighth Circuits, which hold that only "ultimate employment decisions" such as "hiring, firing, promoting, and demoting" are actionable adverse employment actions. *Ray,* 217 F.3d at 1242. The Ninth Circuit has also rejected the intermediate position of the Second and Third Circuits, which hold that "an adverse action is something that materially affects the terms and conditions of employment." *Id.* Rather, the Ninth Circuit is in accord with the First, Seventh, Tenth, Eleventh, and D.C. Circuits,

all of which take an expansive view of adverse employment actions. *Id.* at 1241.

**11.** Both the Fort Shafter MP and the CID conducted investigations of Niimi–Montalbo. Because the two were related, and the CID investigation arose from the MP investigation, the court treats the two as one action. In her Complaint, Niimi–Montalbo also refers to a separate investigation with the U.S. Attorney's Office (USAO) in Honolulu. Compl. ¶ 41. However, as there is no evidence of a separate investigation conducted by the USAO, this court does not consider those allegations.

situation would view the action as disadvantageous." While an investigation might be undesirable or distasteful, it does not automatically or necessarily disadvantage an employee. Niimi–Montalbo offers only evidence as to her alleged subjective reaction to the investigation, including paranoia and anxiety. Given Niimi–Montalbo's argument that she had a stress-related mental disability, it is unlikely that her subjective reaction can establish the objectively adverse nature of the CID investigation.

Even if Niimi–Montalbo could be said to have established a prima facie case on this matter, she does not rebut the legitimate, nondiscriminatory reasons offered by White for the CID investigation. White has offered evidence that Niimi–Montalbo removed her OWCP files from Chang's office without permission, knowing that she was prohibited from doing so. The CID investigation found probable cause that Niimi–Montalbo had taken the files without permission and that she had falsified forms in connection with her OWCP claims. Niimi–Montalbo has not offered any evidence, aside from her own allegations that Chang and Okazaki were to blame, that these reasons were merely pretextual.

### 2. The Hostile Work Environment Claim.

■ A hostile work environment is an actionable basis for a retaliation claim. *Ray*, 217 F.3d at 1245. To determine whether a hostile work environment exists, the court looks to "the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating …; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotations omitted).

■ Niimi–Montalbo fails to show that a hostile work environment existed. To show a hostile work environment, she offers only (1) the fact of the CID investigation and (2) her subjective reaction to the investigation. This is insufficient to support her argument that the CID investigation created a hostile work environment.

### 3. The November 1998 Warning.

Niimi–Montalbo claims that Okazaki's November 1998 letter to her was an adverse employment action. *Vasquez v. Cty. of Los Angeles*, 307 F.3d 884 (9th Cir. 2002), held that a letter of warning placed in an employee's file was not an adverse employment action because it (1) was not disseminated beyond the employee's supervisors; (2) was to be removed after one year; (3) was not undeserved; (4) had no detrimental effect on the employee at the time it was issued; and (5) was unlikely to have any future effect. In this case, Niimi–Montalbo has not shown that the warning letter was placed in her file for any amount of time, that it was disseminated to anyone other than herself, that it was undeserved, or that it had any objectively detrimental effect at the time it was issued. The letter does, on its face, suggest a probable detrimental future effect (termination) if its terms are not satisfied.

■ Even assuming, based only on the preceding fifth factor, that Niimi–Montalbo makes out a prima facie case with respect to the November 1998 warning, she does not rebut the legitimate, nondiscriminatory reasons given by the government for the warning letter. By the time the letter was issued, she had been absent from work for at least nine months. Okazaki has stated that he sent the warning letter because of Niimi–Montalbo's lengthy absence from work. Niimi–Montalbo has not shown that she can demonstrate that the proffered reasons were merely pretextual.

#### 4. *The Notice of Proposed Removal and the Removal.*

■ Niimi–Montalbo cannot make out a prima facie case with respect to the notice of proposed removal issued by Okazaki in February 1999 because that notice was not an adverse employment action. Despite the Ninth Circuit's rejection of other circuits' more restrictive views of adverse employment reactions, the Ninth Circuit does require that an adverse employment action have some degree of finality. For that reason, when an employee has the opportunity to appeal a decision made by her employer, that decision may not be "sufficiently final to constitute an adverse employment action." *Brooks v. City of San Mateo*, 229 F.3d 917, 929–30 (9th Cir.2000). *Brooks* held that an undeserved negative performance review can be an adverse employment action, but not when the review is subject to modification by the employer following an appeal. *Id.* *Brooks* also held that an unfavorable shift rescheduling and the denial of a vacation preference were "not final," as the employer had allowed the employee to switch shifts and vacation dates after she complained. *Id.* at 930. Similarly, the February 1999 notice of proposed removal was not sufficiently final to constitute an adverse employment action.

■ While appealable, Niimi–Montalbo's removal from employment is a classic example of an adverse employment action. However, with respect to this decision, Niimi–Montalbo is not able to establish a causal link between the adverse employment action and her protected activity, as Niimi–Montalbo has also argued that the only reasons for her removal from employment were "time [and] attendance reasons." Pl.'s Opp. at 3. Because Niimi–Montalbo herself concedes that her removal was not retaliatory, she fails to make out a prima facie case with respect to her removal.

### V. CONCLUSION.

For the foregoing reasons, the motions are GRANTED in part and DENIED in part. Dismissal or summary judgment is granted on all claims except for Count V, which alleges a violation of the FMLA, and the claims of discrimination alleged in Counts I and IV with respect to Niimi–Montalbo's alleged disability from February or March 1998 to April 1999.

IT IS SO ORDERED.