William J. RAY, Plaintiff–Appellant,

v.

William J. HENDERSON, Postmaster General, Defendant–Appellee.

No. 99–15289.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 26, 2000.

Filed July 7, 2000.

---

Erik A. Rapoport, San Francisco, California, for the plaintiff-appellant.

Debora G. Luther, Assistant United States Attorney, Sacramento, California, for the defendant-appellee.

Before: FLETCHER, ALARCON, and HAWKINS, Circuit Judges.

FLETCHER, Circuit Judge:

In this case we are called upon to determine whether William J. Ray suffered adverse employment actions after complaining of harassment at his workplace. We hold that in our circuit an adverse employment action is adverse treatment that is reasonably likely to deter employees from engaging in protected activity. Under this standard, we conclude that Ray suffered cognizable adverse employment actions when his employer, in retaliation for Ray's complaints concerning management's treatment of women employees, eliminated employee meetings, eliminated its flexible starting time policy, instituted a "lockdown" of the workplace, and cut Ray's salary. We also hold that Ray has a cognizable claim for retaliation based on his supervisors' creation of a hostile work environment.

I

William Ray has been a rural postal carrier in Willits, California for over 28 years. In addition to Ray, there are four other rural carriers. Ray's immediate su-

pervisor at the Willits Post Office is Dale Briggs, and the Postmaster is Dan Carey.

Prior to the events at issue in this case, the rural carriers had a flexible start-time. Ray and the other carriers generally arrived at work between 6:00 A.M. and 7:00 A.M, and they went out on their delivery routes at 9:45 A.M. Because their salaries were fixed, arriving early did not affect their incomes, however it did give them time to sort mail and do other administrative tasks before leaving on their routes.

In 1994, Ray and his co-workers became concerned about gender bias and harassment at the post office. Several female employees had apparently sought medical advice and transfers because of harassment by Briggs. The subject of the harassment of women first came up at a March 30, 1994 Employee Involvement meeting.[1] At that meeting, a female janitorial employee raised her hand and asked to be recognized to speak. Postmaster Carey "immediately wheeled around, swinging his arm, yelled and pointed. He ordered [the employee] out of the meeting." After she had left, Ray spoke up. He stated his objections to the treatment of women at the post office. Postmaster Carey vehemently denied the charges, and berated Ray as a "liar."

Ray next made a complaint about the treatment of women at an April 7, 1994 Rural Carriers Employee Involvement meeting. Carey again angrily denied the charges. After these complaints failed to spur any change, Ray and two of his co-workers wrote a letter complaining of the harassment of women to Lito Sajones, Carey's supervisor.

The letter prompted a meeting, held in the nearby Ukiah Post Office on June 15, 1994, regarding the alleged harassment. At that meeting, Carey stated his displeasure that Ray had written the complaint to his supervisor. He said that, because of the letter, "I may have to change my

---

1. Employee Involvement meetings are a means for employees to communicate with the management regarding workplace issues.

whole approach to management. I've been a manager for eighteen years. I have left you alone. Its called self-management. I may have to change that."

Carey did not effectuate that threat until February 1995. However, in the meantime Briggs and Carey publicly berated Ray on a regular basis. For example, Briggs yelled at Ray at a staff meeting on November 10, 1994, after Ray had made a suggestion for improving efficiency at the office. On December 24, 1994, Postmaster Carey called Ray a "rabble rouser" and a "troublemaker," and said he would cancel all future Employee Involvement meetings at the post office, apparently to avoid further complaints about gender bias and harassment. He also stated that "if Bill Ray has so much time for talking, maybe he is coming in [to the office] too early." This was another veiled threat to end the "self management" policy under which workers set their own starting and finishing times.

One week later, Ray met with Briggs and Carey to discuss employees' rights to communicate with other employees. Ray fled the meeting after Carey yelled at him and made physically threatening gestures toward him.

One month later, on January 31, 1995, Ray and the union shop steward, Bob Daitoku, met with Carey to discuss Carey's recent decision to cancel the Employee Involvement meetings. Carey stated that "We're not having any E.I. program as long as you're writing letters over my head."

Postmaster Carey made good on his threat to eliminate both the Employee Involvement program and the "self-management" policy soon after the January meeting. In February 1995, Briggs announced that all rural carriers were required to come to work at a fixed starting time: 7:00 A.M. When the fixed start time was instituted, the postal carriers found themselves with less time to sort the mail prior to going out on their routes. Ray states that he had the longest route and the largest amount of mail to sort; the 7:00 A.M. start time forced him to work at top speed, sorting 60 letters per minute and 40 magazines per minute, even though the Rural Carrier Handbook states that the standard allowable rate for sorting mail is 16 letters per minute and 8 magazines per minute. The 7:00 A.M. start time also forced Ray to work later in the afternoon so that he could finish some of the administrative tasks that he had previously done in the morning.

In May 1995, Ray's wife became extremely ill. Ray wanted to leave work earlier in order to take care of her, and he therefore requested to come to work half an hour early—at 6:30 A.M. While Briggs granted the request, he repeatedly threatened to retract the early start time.

Ray continued to be the target of Briggs and Carey's hostility during the summer and fall of 1995. On one occasion, after Ray made a suggestion at an office meeting, Briggs yelled at him, telling him to "shut up" and "that's a direct order."

Ray was twice falsely charged with misconduct. He was accused, and then cleared, of opening a package. He was later accused, and then cleared, of knocking down a mailbox on his route. Also, a series of pranks were played on Ray during this time. For example, someone left a dog biscuit near Ray's work space. On another occasion, Ray found a ball bearing in his work space.

On October 13, 1995, Ray filed a request for counseling with the EEOC, complaining of a hostile work environment. He alleged that the management at the Willits Post office employed a "singling-out-and-punish method of controlling and frightening and eventually demoralizing the workers." In his EEOC request he also stated that:

It is because of [management's] conviction they are doing the right thing that makes the situation so troubling and actionable at law. The Joint Statement on Violence and Behavior In the Workplace clearly outlaws their practices and

a continuation of their pattern will be dire. Four people have said to me the SPO should be killed. They were speaking out of frustration and pain. But this should show that the situation is not isolated to my complaint.

On November 7, 1995, Ray took stress leave from work. On November 22, while Ray was still out on stress leave, Postmaster Carey received a copy of the EEO complaint. He immediately instituted a procedure called "lockdown" at the Willits Post Office.[2] During lockdown, the doors to the loading docks were kept locked at all times. Every time Ray (or another postal carrier) needed to load his vehicle with mail, he would have to unlock the doors, push his mail cart out onto the loading dock, go back inside and lock the doors, and then exit through a side door to take the mail from the cart into his car. To get back inside the post office, he would have to ring a bell and wait for another postal employee to open the door. The lockdown procedure turned a process that had taken seconds into one taking several minutes.

Postmaster Carey states that he instituted the lockdown because Ray's complaint to the EEO contained a death threat. Briggs ordered Ray not to come back to the office, and called in a Postal Inspector to determine whether the EEO letter constituted a threat. The Inspector, Robert Dortch, conducted an investigation into the matter. He determined that no death threat had been made, and Ray was allowed to return to work. Nonetheless, even after the inspector had cleared Ray of wrongdoing, a temporary supervisor, Bill Wilber, announced to the staff that Ray had made a death threat. The lockdown at the Willits Post Office continued until February 1996, when it was discontinued without explanation.

Also in response to the supposed death threat, on December 1, 1995 Postmaster Carey canceled Ray's 6:30 start time, re-quiring him to arrive at work at 7:00 A.M. Carey stated that he did not want Ray coming to work early because he "had to be supervised at all times."

·Ray wrote additional EEO complaint letters on December 13, 1995, January 15 and 21, 1996, and April 1, 1996. In March 1996, Ray's postal route was reduced by 90 boxes, causing him to lose approximately $3,000 from his annual salary. Although all the postal carriers suffered cuts in their routes, Ray's route was cut the most.

Ray's EEO complaint was heard by an Administrative Law Judge (ALJ) on May 28, 1997. The ALJ found that the United States Postal Service (USPS) had retaliated against Ray after he filed his written EEO counseling request, but rejected Ray's remaining claims. The USPS rejected the ALJ's finding of retaliation and entered a final agency decision rejecting all of Ray's claims on August 13, 1997.

Ray then filed suit in federal district court. His First Amended Complaint alleged retaliation for engaging in protected activity, discrimination, and failure to make accommodations for Ray to allow him to care for his ill wife. The district court granted summary judgment for the defendant on all claims. Ray appeals only the grant of summary judgment on his retaliation claim.

II

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We review the district court's decision to grant summary judgment de novo. *See Robi v. Reed*, 173 F.3d 736, 739 (9th Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 375, 145 L.Ed.2d 293 (1999). In reviewing an order denying or granting summary judgment, we must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the

---

**2.** It is unclear from the record whether lockdown is a standard post office procedure. Ray asserts that lockdown procedures had never been instituted in the Willits Post Office before November 1995.

district court correctly applied the substantive law. *See id.*

## III

■ Title VII prohibits employers from discriminating against an employee because that employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). A postal employee may bring suit under § 2000e–3(a) pursuant to 42 U.S.C. § 2000e–16. *See Ayon v. Sampson,* 547 F.2d 446, 450 (9th Cir.1976).

■ To make out a prima facie case of retaliation, an employee must show that (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *See Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1464 (9th Cir.1994). If a plaintiff has asserted a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision. *Id.* at 1464–1465. If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive. *Id.*

■ The parties do not contest that Ray engaged in protected activities when he complained of the treatment of women at the Willits Post Office both informally and formally with the EEOC.[3] The heart of this dispute is whether Ray suffered cognizable adverse employment actions.

Ray asserts that he suffered from changes in workplace policy and pay, as well as from a hostile work environment. We first examine the definition of an adverse employment action. We then discuss whether the changes in workplace policy and pay constitute adverse employment actions, and whether Ray has established a causal link between his protected activities and those adverse employment actions. Finally, we examine whether Ray's allegation that he was subjected to a hostile work environment in retaliation for engaging in protected activity is cognizable under the anti-retaliation provisions of Title VII.

## IV

The circuits are currently split as to what constitutes an adverse employment action. Although we have yet to articulate a rule defining the contours of an adverse employment action, our prior cases situate us with those circuits that define adverse employment action broadly. Other circuits that define adverse employment action broadly are the First, Seventh, Tenth, Eleventh and D.C. Circuits. An intermediate position is held by the Second and Third Circuits. The most restrictive view of adverse employment actions is held by the Fifth and Eighth Circuits. Below, we set forth the Ninth Circuit's position within this split, and explain the case law in the other circuits. Then, we examine what guidelines we should follow in analyzing whether an action constitutes an adverse employment action.

■ We have found that a wide array of disadvantageous changes in the workplace constitute adverse employment actions.

---

**3.** As the statutory language quoted above indicates, filing a complaint with the EEOC is a protected activity. *See* 42 U.S.C. § 2000e–3(a). Making an informal complaint to a supervisor is also a protected activity. *See Equal Employment Opportunity Commission v. Hacienda Hotel,* 881 F.2d 1504, 1514 (9th Cir.1989).

Furthermore, an employee's complaints about the treatment of others is considered a protected activity, even if the employee is not

a member of the class that he claims suffered from discrimination, and even if the discrimination he complained about was not legally cognizable. *See Moyo v. Gomez,* 40 F.3d 982 (9th Cir.1994) (prison guard had a claim for retaliation if he was discharged for complaining about the treatment of black inmates and he was acting on a reasonable belief that a Title VII violation had occurred, even though the complained-of discrimination was not actually a Title VII violation).

While "mere ostracism" by co-workers does not constitute an adverse employment action, *see Strother v. Southern California Permanente Medical Group*, 79 F.3d 859, 869 (9th Cir.1996), a lateral transfer does. In *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.1987), we held that "[t]ransfers of job duties and undeserved performance ratings, if proven, would constitute 'adverse employment decisions.'" The *Yartzoff* decision was in line with our earlier decision in *St. John v. Employment Development Dept.*, 642 F.2d 273, 274 (9th Cir. 1981), where we held that a transfer to another job of the same pay and status may constitute an adverse employment action.[4]

Similarly, in *Hashimoto v. Dalton*, 118 F.3d 671, 676 (9th Cir.1997), we found that the dissemination of an unfavorable job reference was an adverse employment action "because it was a 'personnel action' motivated by retaliatory animus." We so found even though the defendant proved that the poor job reference did not affect the prospective employer's decision not to hire the plaintiff: "That this unlawful personnel action turned out to be inconsequential goes to the issue of damages, not liability." *Id.*

In *Strother*, we examined the case of an employee who, after complaining of discrimination, was excluded from meetings, seminars and positions that would have made her eligible for salary increases, was denied secretarial support, and was given a more burdensome work schedule. 79 F.3d at 869. We determined that she had suffered from adverse employment actions. *Id.*

These cases place the Ninth Circuit in accord with the First, Seventh, Tenth, Eleventh and D.C. Circuits. These Circuits all take an expansive view of the type of actions that can be considered adverse employment actions. *See Wyatt v. City of Boston*, 35 F.3d 13, 15–16 (1st Cir.1994) (adverse employment actions include "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations and toleration of harassment by other employees"); *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir.1996) (employer can be liable for retaliation if it permits "actions like moving the person from a spacious, brightly lit office to a dingy closet, depriving the person of previously available support services ... or cutting off challenging assignments"); *Corneveaux v. CUNA Mutual Ins. Group*, 76 F.3d 1498, 1507 (10th Cir.1996) (employee demonstrated adverse employment action under the ADEA by showing that her employer "required her to go through several hoops in order to obtain her severance benefits"); *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir.1996) (malicious prosecution by former employer can be adverse employment action); *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th

---

4. The government cites *Steiner v. Showboat Operating Co.*, 25 F.3d 1459 and *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 912 (9th Cir.1996), for the proposition that a lateral transfer is not an adverse employment action.

In *Steiner*, this court stated in dicta and in a footnote that "the transfer is just barely—if at all—characterizable as an 'adverse' employment action: Steiner was not demoted, or put in a worse job, or given any additional responsibilities. In fact, at first she even claimed to enjoy the day shift." 25 F.3d at 1465 n. 6. The court did not reach the question of whether the transfer was an adverse employment action because it found that the action was not retaliatory in nature. *Id.* at 1465. In *Nidds*, this court, citing *Steiner*, found that the plaintiff's transfer was not an adverse employment action. 113 F.3d at 919. However, it conducted no analysis to reach this point, merely asserting that "Although we decline to view Nidds' transfer to the restoration department as an adverse employment action, his ultimate termination on July 28, 1992 certainly was." *Id.*

Neither *Steiner* nor *Nidds* establish that a lateral transfer can never be an adverse employment action. Had they done so, they would have had to abrogate this court's earlier decisions in *Yartzoff* and *St. John, supra*, neither of which were cited in the *Steiner* and *Nidds* decisions. We therefore reject the government's assertion that a lateral transfer cannot be an adverse employment action for the purposes of Title VII.

Cir.1998) (adverse employment actions include an employer requiring plaintiff to work without lunch break, giving her a one-day suspension, soliciting other employees for negative statements about her, changing her schedule without notification, making negative comments about her, and needlessly delaying authorization for medical treatment); *Passer v. American Chemical Soc.*, 935 F.2d 322, 330–331 (D.C.Cir.1991) (employer's cancellation of a public event honoring an employee can constitute adverse employment action under the ADEA, which has an anti-retaliation provision parallel to that in Title VII).

The Second and Third circuits hold an intermediate position within the circuit split. They have held that an adverse action is something that materially affects the terms and conditions of employment. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir.1997) ("retaliatory conduct must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment ... to constitute [an] 'adverse employment action'"); *Torres v. Pisano*, 116 F.3d 625, 640 (2nd Cir.1997) (to show an adverse employment action employee must demonstrate "a materially adverse change in the terms and conditions of employment") (quoting *McKenney v. New York City Off–Track Betting Corp.*, 903 F.Supp. 619, 623 (S.D.N.Y.1995)).

The Fifth and Eighth Circuits, adopting the most restrictive test, hold that only "ultimate employment actions" such as hiring, firing, promoting and demoting constitute actionable adverse employment ac-

tions. *See Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir.1997) (only "ultimate employment decisions" can be adverse employment decisions); *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir.1997) (transfer involving only minor changes in working conditions and no reduction in pay or benefits is not an adverse employment action).

The government urges us to turn from our precedent, and to adopt the Fifth and Eighth Circuit rule that only "ultimate employment actions" such as hiring, firing, promoting and demoting constitute actionable adverse employment actions.[5] But we cannot square such a rule with our prior decisions. Actions that we consider adverse employment actions, such as the lateral transfers in *Yartzoff* and *St. John*, the unfavorable reference that had no affect on a prospective employer's hiring decisions in *Hashimoto*, and the imposition of a more burdensome work schedule in *Strother* are not ultimate employment actions. Nor, for that matter, does the test adopted by the Second and Third Circuits comport with our precedent. While some actions that we consider to be adverse (such as disadvantageous transfers or changes in work schedule) do "materially affect the terms and conditions of employment," others (such as an unfavorable reference not affecting an employee's job prospects) do not.

 The EEOC has interpreted "adverse employment action" to mean "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from

---

**5.** The government relies on *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) for the proposition that only ultimate employment actions such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities [and] a decision causing a significant change in benefits" constitute adverse employment actions. But the discussion in *Burlington Industries* cited by the government concerns the types of employment actions which, if taken by a supervisor, would subject the employer to vicarious liability for harassment. *See* 524 U.S. at 760–761, 118

S.Ct. 2257. Although the Supreme Court cited to circuit-level Title VII cases that defined "adverse employment actions," the Court specifically declined to adopt the holdings of those cases: "Without endorsing the specific results of those decisions, we think it prudent to import the concept of a tangible employment action for resolution of the vicarious liability issue we consider here." *Id.* at 761, 118 S.Ct. 2257. Therefore, we reject the contention that *Burlington Industries* set forth a standard for adverse employment actions in the anti-retaliation context.

engaging in protected activity." EEOC Compliance Manual Section 8, "Retaliation," ¶ 8008 (1998). Although EEOC Guidelines are not binding on the courts, they "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)); *see also Gutierrez v. Municipal Court,* 838 F.2d 1031, 1049 (9th Cir.1988). We find the EEOC test to be consistent with our prior holdings, and with the holdings in the First, Seventh, Tenth, Eleventh and D.C. Circuits.

 The EEOC test covers lateral transfers, unfavorable job references, and changes in work schedules. These actions are all reasonably likely to deter employees from engaging in protected activity. Nonetheless, it does not cover every offensive utterance by co-workers, because offensive statements by co-workers do not reasonably deter employees from engaging in protected activity. ·

As we stated in *Hashimoto,* the severity of an action's ultimate impact (such as loss of pay or status) "goes to the issue of damages, not liability." 118 F.3d at 676. Instead of focusing on the ultimate effects of each employment action, the EEOC test focuses on the deterrent effects. In so doing, it effectuates the letter and the purpose of Title VII. According to 42 U.S.C. § 2000e–3(a), it is unlawful "for an employer to discriminate" against an employee in retaliation for engaging in protected activity. This provision does not limit what type of discrimination is covered, nor does it prescribe a minimum level of severity for actionable discrimination. *See Knox* 93 F.3d at 1334 ("There is nothing in the law of retaliation that restricts the type of retaliatory act that might be visited upon an employee who seeks to invoke her rights by filing a com-

plaint."). We agree with the D.C. Circuit, which noted in *Passer* that:

> The statute itself proscribes "discriminat[ion]" against those who invoke the Act's protections; the statute does not limit its reach only to acts of retaliation that take the form of cognizable employment actions such as discharge, transfer or demotion. . . . . "[T]o establish a prima facie case under section 704(a) [42 U.S.C. § 2000e–3(a) ], a plaintiff must show: 1) that he or she engaged in activity protected by the statute; 2) that *the employer . . . engaged in conduct having an adverse impact on the plaintiff;* and 3) that the adverse action was causally related to the plaintiff's exercise of protected rights."

935 F.2d at 331 (emphasis in original) (citing *Berger v. Iron Workers Reinforced Rodmen Local 201,* 843 F.2d 1395, 1423 (D.C.Cir.) (per curiam), *supplemented on other grounds on reh'g,* 852 F.2d 619 (D.C.Cir.1988)).

Because the EEOC standard is consistent with our prior case law and effectuates the language and purpose of Title VII, we adopt it, and hold that an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity.[6]

We now turn to the question of whether the actions alleged by Ray constitute adverse employment actions under this standard, whether Ray has provided sufficient evidence of a causal link between his protected activities and the adverse employment actions, and whether he can overcome the USPS' proffered nondiscriminatory reasons for the actions.

## V

 Ray claims that, in retaliation for his complaints, his supervisors eliminated the Employee Involvement program, eliminated the flexible start-time policy, instituted lockdown procedures, and reduced

**6.** The first part of the EEOC's definition of adverse employment action, which requires that the action be "based on a retaliatory motive," collapses into the "causal link" prong of the prima facie test for retaliation.

his workload—and his pay—disproportionately to the reductions faced by other employees.[7]

We conclude that all four qualify as adverse employment actions. The actions decreased Ray's pay, decreased the amount of time that he had to complete the same amount of work, and decreased his ability to influence workplace policy, and thus were reasonably likely to deter Ray or other employees from complaining about discrimination in the workplace.

We also find that Ray has established a causal link between his protected activity and the employment actions by demonstrating that each action was implemented close on the heels of his complaints. That an employer's actions were caused by an employee's engagement in protected activities may be inferred from "proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff,* 809 F.2d at 1371.

What remains, therefore, is an examination of whether Ray has produced sufficient evidence supporting his contention that the nondiscriminatory reasons proffered by the Postal Service are pretexts for retaliation. We find that he has. The USPS alleges that Carey and Briggs eliminated flexible starting times because of an increase in the amount of mail and because of later delivery of the mail to the post office. However, it is undisputed that Postmaster Carey announced publicly that he was instituting the fixed start time in response to Ray's complaints. Furthermore, the USPS' assertion is belied by the fact that even after the policy change several of the postal carriers continued to arrive at work early with official sanction.

The Postal Service also asserts that Carey instituted the lockdown procedures in response to a death threat, not for retaliatory reasons. Ray contends that this is false, and points to the fact that his supervisors continued the lockdown even after

the postal inspector had stated definitively that there was no death threat. Also, supervisory employees continued to say publicly that Ray had made a threat when they knew that that was not the case. We are sensitive to the Postal Service's desire to protect its employees and customers from violence, and nothing should prevent management from taking precautionary steps. Certainly, locking the doors ensured that unauthorized persons could not enter the building, and thus enhanced security. Nonetheless, a lockdown such as that implemented by the postal service seems unlikely to prevent harm from a disgruntled employee working inside the building, nor would the lockdown stop a violent postal employee from entering the post office, since an employee would probably open the door from inside for any coworker; indeed, if anything, the lockdown ensured that employees would find it more difficult to leave. Although the reasons for the lockdown present a close question, we conclude that Ray has raised a genuine issue of material fact, and that there is sufficient evidence to survive summary judgment on this claim.

Finally, the USPS claims that the reduction in Ray's pay was part of across-the-board cuts, and was nondiscriminatory. However, Ray has sufficiently rebutted this assertion by demonstrating that he suffered the greatest loss in pay.

We therefore hold that, viewing the evidence in the light most favorable to Ray, the district court erred in granting summary judgment on the retaliation claim.

## VI

We now examine whether Ray's allegation that he was subjected to a hostile work environment is cognizable under the anti-retaliation provisions of Title VII. We have not previously decided whether a hostile work environment may be the basis for a retaliation claim under Title VII. *See Gregory v. Widnall,* 153 F.3d 1071, 1075

---

7. He also alleges that his supervisors created a hostile work environment that constituted an adverse employment action. We discuss the hostile work environment claim in the following section.

(9th Cir.1998). However, the Second, Seventh and Tenth Circuits have held that an employer may be liable for a retaliation-based hostile work environment. *See Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 446 (2nd Cir.1999) ("co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the second prong of the retaliation *prima facie* case"); *Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 886 (7th Cir.1998) ("retaliation can take the form of a hostile work environment"); *Gunnell v. Utah Valley State College,* 152 F.3d 1253, 1264 (10th Cir.1998) ("co-worker hostility or retaliatory harassment, if sufficiently severe, may constitute 'adverse employment action' for purposes of a retaliation claim").

We agree with our sister circuits. Harassment is obviously actionable when based on race and gender. Harassment as retaliation for engaging in protected activity should be no different—it is the paradigm of "adverse treatment that is based on retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." EEOC Compliance Manual ¶ 8008.

 Harassment is actionable only if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). It must be both objectively and subjectively offensive. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). To determine whether an environment is sufficiently hostile, we look to the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (*quoting Harris,* 510 U.S. at 23, 114 S.Ct. 367).

Not every insult or harassing comment will constitute a hostile work environment.

In *Gregory v. Widnall,* we rejected a claim of a hostile work environment based on "[a] single drawing of a monkey on a memo circulated by senior NCO's, accompanied by the verbal explanation that it was intended to remind officers not to 'get the monkey off their back' by passing their responsibilities to others." 153 F.3d at 1074–75; *see also Strother,* 79 F.3d at 869 ("mere ostracism in the workplace is not enough to show an adverse employment decision").

 Repeated derogatory or humiliating statements, however, can constitute a hostile work environment. In *Hacienda Hotel,* for example, we found that the plaintiffs had demonstrated sufficiently "severe or pervasive" harassment by demonstrating that one supervisor "repeatedly engaged in vulgarities, made sexual remarks, and requested sexual favors" while another supervisor "frequently witnessed, laughed at, or herself made these types of comments." 881 F.2d at 1515. And in *Draper v. Coeur Rochester, Inc.,* 147 F.3d 1104, 1109 (9th Cir.1998), we found that the appellant's allegations that her supervisor had regularly made sexual remarks about her throughout her employment, and that he laughed at her complaints to him, raised a genuine factual issue regarding a hostile work environment.

 Here, after Ray made his complaint about the treatment of women at the Willits Post Office, he was targeted for verbal abuse related to those complaints for a period lasting over one and half years. His supervisors regularly yelled at him during staff meetings; they called him a "liar," a "troublemaker," and a "rabble rouser," and told him to "shut up." Additionally, Ray was subjected to a number of pranks, and was falsely accused of misconduct.

Not only did his supervisors make it harder for Ray to complete his own tasks, they made Ray an object lesson about the perils of complaining about sexual harassment in the workplace. Carey and Briggs made it clear to the other staff members

that disadvantageous changes in management style were due to Ray's complaints. Carey linked the change to a fixed starting time to Ray's letter to Carey's supervisor. He canceled the Employee Involvement meetings in response to Ray's complaints. Carey and Briggs also fostered animus in other employees whose working conditions were affected. Other employees began to distance themselves from Ray, and some stopped talking to him. In November of 1995, the difficulties at work rose to such a level that Ray took stress leave from his job.

We conclude that Ray has presented evidence that is, for purposes of summary judgment, sufficient to raise a genuine issue of fact as to whether he was subjected to a hostile work environment. We therefore hold that the district court erred in granting summary judgment on the hostile work environment-based retaliation claim.

### VII

For the foregoing reasons, we REVERSE the district court grant of summary judgment and REMAND for a trial on the merits of Ray's retaliation claim.