Gary COLE, Plaintiff,

v.

MAINE SCHOOL ADMINISTRATIVE
DISTRICT NO. 1, Defendant.

No. CIV. 03–205–B–W.

United States District Court,
D. Maine.

Dec. 3, 2004.

Arthur J. Greif, Gilbert & Greif, P.A., Julie D. Farr, Gilbert & Greif, P.A., Bangor, ME, for Gary Cole, Plaintiff.

Melissa A. Hewey, Drummond, Woodsum & Macmahon, Portland, ME, for Maine School Administrative District # 1, Defendant.

## ORDER

WOODCOCK, District Judge.

Gary Cole, a public school teacher, claims the Maine School Administrative District 1 (District) is violating his First Amendment rights by buckling to pressure from Christian fundamentalists and restricting his ability to teach his students about non-Christian religions. Mr. Cole also claims he has suffered adverse employment actions in retaliation for exercising First Amendment rights. The District asserts it is entitled to summary judgment since Mr. Cole's case has nothing to do with the First Amendment and everything to do with the overriding right of the School District to decide what its students must be taught. Because Mr. Cole has generated genuine issues of material fact, this Court denies the District's Motion for Summary Judgment.

## I. STATEMENT OF FACTS

In accordance with "conventional summary judgment praxis," the Court recounts the facts in a light most favorable to Gary Cole's theory of the case consistent with record support.[1] *Gillen v. Fallon Ambulance Serv.*, 283 F.3d 11, 16 (1st Cir.2002). The Court has relied either on the uncontested facts or on Mr. Cole's version, if in conflict.[2]

Gary Cole has been a teacher since 1969. Having taught social studies and language arts elsewhere from 1969 to 1983, Mr. Cole began teaching seventh grade language arts at Skyway Middle School in 1983; Skyway Middle School is one of two middle schools within the District. (DSMF ¶¶ 2–3).[3] In 1995, Mr. Cole began to teach seventh grade social studies. (DSMF ¶ 4). For the first two years, things went well

1. Mr. Cole has filed two motions to strike: 1) a motion dated June 22, 2004, addressing paragraphs 10 and 11 of the District's Statement of Material Fact; and, 2) a motion dated July 1, 2004, addressing paragraph 4 and exhibit A of the affidavit of Gehrig Johnson. This Court dismisses each motion to strike, because none of the objected to facts is necessary to resolve the District's motion for summary judgment.

2. The District's main contention is the impetus for the curriculum change had nothing to do with religion. Its source instead was the Presque Isle High School ninth grade World History teacher who complained that students coming from Skyway Middle School had been taught the history she intended to teach; whereas, students from Cunningham Middle School had been taught European history. Ms. Pamela Hallett went about making certain the District coordinated the High School and Middle School curricula. Ms. Hallett's sole motivation was the need to have a district-wide curriculum plan. The Committee responsible for the curriculum was manned by education professionals, not members of the Board. It contained one administrator and six teachers from elementary through high school. This Court is prevented from reaching the District's arguments, because the Plaintiff has denied most of what the District has asserted as fact This leaves genuine issues of material fact, regardless how they may later be resolved by a fact-finder.

3. The Defendant's Statements of Material Fact will be cited as DSMF; Plaintiff's Response to DSMF as PRSMF; Plaintiff's Statements of Material Fact as PSMF; Defendant's Reply to Plaintiff's Statement of Material Fact as DRSMF.

and he was complimented by Pamela Hallett, the District's curriculum coordinator. (PSMF ¶ 55). Mr. Cole's social studies course covered the history, culture, and religion of the eastern hemisphere. He sought and received permission from Ms. Hallett to teach from a textbook called *Human Heritage*, since the old textbook, *Europe and the Soviet Union*, was outdated.[4] (PSMF ¶¶ 56–57). From 1995 through the 1997 school year, the Skyway Middle School curriculum required the teaching of European and Asian history. (PSMF ¶ 100). This curriculum is consistent with how seventh grade is taught state-wide as recommended by the Maine Department of Education. (PSMF ¶ 97).

Before September 1997, Mr. Cole met with Ms. Hallett and Kevin Sipe, a seventh grade social studies teacher at Cunningham Middle School, the companion middle school within the District. (PSMF ¶ 58). Ms. Hallett reviewed the Maine Learning Results requirements. (PSMF ¶ 59). Mr. Cole was fully implementing the requirements; Mr. Sipe was implementing virtually none of the requirements. (PSMF ¶ 60). Ms. Hallett suggested to Mr. Cole and Mr. Sipe they get together, so that Mr. Sipe could implement Mr. Cole's curriculum. (PSMF ¶ 61).

Beginning the 1997–98 school year, Mr. Cole intended to pursue the same curriculum he had followed previous years. (PSMF ¶ 62). In early September, 1997, Skyway Middle School held an Open House. At the Open House, Mr. Cole was confronted by one of the parents, Donalee Olsen, who became "very verbal, very angry" at Mr. Cole. (PSMF ¶ 63). Ms. Olsen was very upset about the topics Mr. Cole had told her would be covered and she was "very concerned about the religious aspect of those topics." *Id.*

Shortly after the Open House, Ms. Olsen visited Mr. Cole's class. He was teaching about Cro Magnons and cave paintings. (PSMF ¶ 66). Ms. Olsen has testified she believes every word of the Bible is true, including that the earth is probably 8,000 to 10,000 years old. *Id.* Mr. Cole taught the class that Cro Magnon man is at least 40,000 years old. *Id.* As he discussed this topic, he noticed Ms. Olsen's face becoming redder and redder and she looked very angry. *Id.* At the end of the class, Mr. Cole spoke with Ms. Olsen and asked what she did for work; she very angrily responded she home-schooled her children. (PSMF ¶ 67). Later that same day, Mr. Cole passed by the principal's office and observed Ms. Olsen inside. (PSMF ¶ 68).[5] Ms. Olsen was visibly upset. *Id.* The next day, Ms. Olsen's son failed to return to Mr. Cole's class; in fact, he never returned to Mr. Cole's classroom. *Id.*

Before changes in the curriculum, Mr. Cole also spoke with Debbie Carter, Ms. Olsen's sister. (PSMF ¶ 69). Ms. Carter objected to what Mr. Cole was teaching, specifically to "that old stuff, ancient history and stuff." *Id.* During their discussions about the religions of the eastern hemisphere, Mr. Cole felt Ms. Carter's objections were related to her religious beliefs. (PSMF ¶ 70). When Mr. Cole and Ms. Carter discussed the teaching of evolution,

---

4. As with a number of the Plaintiff's Statements, the District denies Ms. Hallett gave Mr. Cole permission to teach from *Human Heritage*. (DRSMF ¶ 57). It contends she told him only he could use it as a resource. (DRSMF ¶ 57). The Court assumes the truth of Mr. Cole's statement for purposes of this motion.

5. PSMF ¶ 68 actually refers to Ms. Carter being upset. The Court assumes this is a typographical error, since the rest of the paragraph and the context of paragraph 68 concerns Ms. Olsen. This assumption is made, despite the fact the District admitted paragraph 68 without qualification.

Ms. Carter told Mr. Cole she had left her daughter Jillian in his classroom, because she knew Jillian's faith was strong and there would not be any problem for her. (PSMF ¶ 71).

Ms. Olsen and Ms. Carter are grand-daughters of Reverend Blackstone, who was a minister at the Dunntown Advent Christian Church. (PSMF ¶ 49). They are members of the State Road Advent Church. (PSMF ¶ 50). Robert Davis, the former chair of the Board of Education for M.S.A.D. No. 1, is a member of the State Road Advent Church. (PSMF ¶ 53).[6] In 1983, Robert Carter, a former principal at Skyway, informed Mr. Cole that the people at State Road Advent Church "think they can run the school."[7] (PSMF ¶ 99).

On September 15, 1997, Mr. Cole received a note from Ms. Hallett notifying him of a meeting at Presque Isle High School to discuss the discrepancies in the seventh grade social studies curriculum. (PSMF ¶ 74). Mr. Cole arrived early at the meeting and discovered everyone else was already there and seated behind a long table. He was told to sit in a chair in front (PSMF ¶ 75). Present at the meeting were: Pamela Hallett; Kevin Sipe; John Graves, the principal of Skyway Middle School; and, other teachers Mr. Cole did not recognize. (PSMF ¶ 75). At the meeting, Ms. Hallett told Mr. Cole he should not be teaching what the High School World History teacher was teaching. (DSMF ¶ 16). Ms. Hallett informed Mr. Cole his whole program was wrong and he should not be teaching about Ancient Greece, because it is taught in high school. (PSMF ¶ 76). Mr. Cole was not told what he should be teaching, just what he should not be teaching. *Id.* Ms. Hallett did most of the talking and instructed Mr. Cole he was "teaching too much." *Id.* The only reason Ms. Hallett gave at the meeting for the directive not to teach Asian history was the District had decided it was going to be taught in Ninth, not Seventh Grade. (DSMF ¶ 18).

6. The District both admitted and denied PSMF ¶ 53, which stated in part: "Robert Davis, who is or was the chairman of the Board of Education for MSAD # 1, is a member of the State Road Advent Christian Church." The District agreed that Robert Davis is a member of the Church and that "in 1998, prior to the events giving rise to Plaintiff's claim in this case, he was the chair of the Board of Education." The District stated, however, the Plaintiff's citations failed to support the contention Mr. Davis is the Chair. The Plaintiff's record citations were to three depositions: his own, Ms. Carter, and Ms. Olsen. Mr. Cole's deposition refers to his testimony that Mr. Davis was "the chairman of the school committee at that particular time was and is a member of that church." *Cole Dep.* at 82. It is unclear what "particular time" he was referring to. The references in Ms. Olsen's and Ms. Carter's depositions are to their deposition testimony that "at one point," Robert Davis was the chair of the board of education. *Olsen Dep.* at 34, lines 5—9; *Carter Dep.* at 31–32. Again, it is unclear when. This Court agrees with the District that Mr. Cole's record citations do not allow the Court to draw a conclusion as to when Mr. Davis was Chair of the Board of Education.

7. Plaintiff's Memorandum cites PSMF ¶ 99 for the proposition that Mr. Carter "indicated (the church) had a very strong influence over the school district and thought that it controlled the school district." Pl.'s Mem. In Opposition to Def.'s Mem. at 5. This is inaccurate. PSMF ¶ 99 states in part: "Mr. Carter said: 'Gary, I just want you to know this. None of this had anything to do with you. I want to tell you, there's a church in Mapleton where the people there think they can run the school and their person did not get the job." This is based on paragraph 21 of Mr. Cole's Affidavit, which contains the same quote. The Plaintiff's Memorandum is inaccurate in two respects: first, Mr. Carter referred to the school, not the district; and, second, Mr. Carter stated only that the church members think they can run the school, not that they in fact have a very strong influence over the school.

Mr. Cole was directed to stop using the textbook, *Human Heritage*, and to teach from *Europe and the Soviet Union*. (PSMF ¶ 77). *Europe and the Soviet Union* was an outdated textbook; seven years had passed since the Soviet Union had been disbanded. *Id.* During the two previous years, Ms. Hallett had agreed *Europe and the Soviet Union* was not an appropriate textbook for either Mr. Sipe or Mr. Cole to use in class and, in fact, it had never been used at Skyway Middle School, since it was purchased in 1991. *Id.*

Mr. Cole told Ms. Hallett he would comply with her directive and he did so. (PSMF ¶ 78). Mr. Cole understood the District did not want a teacher in middle school teaching the same subjects as a teacher in high school. (DSMF ¶ 17). However, Mr. Cole was uncertain what he was and was not supposed to teach. (PSMF ¶ 79). He was told to teach about Europe, but not Ancient Greece; told to teach the history of Europe, but not the Middle Ages in Europe; told not to teach any history on the Ninth Grade curriculum, which included European history, but to teach European history, including the Reformation and the Renaissance. (PSMF ¶¶ 79, 88, 89–91).

Shortly after the September 15, 1997 meeting, Mr. Cole sought out Gehrig Johnson, the District's Superintendent. (PSMF ¶ 85). Mr. Cole mentioned the Blackstones (Ms. Olsen and Ms. Carter). *Id.* Mr. Cole emphasized the Europe-only curriculum conflicted with the actual curriculum the District had adopted and conflicted with the Maine Learning Results. *Id.* After pointing out these curriculum changes took place after both Ms. Olsen

and Ms. Carter complained, he suggested the District was letting the State Road Advent Christian Church and the Blackstones run the District. *Id.* Dr. Johnson responded: "Yeah, I'm letting them run the school. It makes it easier for me. Do you have any complaint about the way they're doing it?" [8] (PSMF ¶ 86).

On November 3, 1997, Mr. Cole wrote Ms. Hallett for guidance; she failed to respond. (PSMF ¶¶ 81, 82). He wrote her again on September 14, 1998, concerning the results of a meeting among Mr. Sipe, Ms. Hallett and Mr. Cole in which he summarized their agreement on implementation of the Maine Learning Results. (PSMF ¶ 112). Again, Ms. Hallett failed to respond. *Id.*

Mr. Cole has continued to teach at Skyway. However, on January 11, 2001, Mr. Graves wrote to Mr. Cole, instructing him to follow the curriculum's course of study, noting he had taught major units of study of Sumaria, Ancient Egypt, Ancient Israel, and he was preparing to teach Ancient Greece in January 2001. (PSMF ¶ 79— Ex. 11). The letter stated it would be placed in his personnel file and any "violation of this directive will result in further disciplinary action against you." *Id.* On June 2, 2004, his attorney received a letter from the District's attorney, threatening to terminate him on the ground his employment is "unprofitable to the school." (PSMF ¶ 115). The District's lawyer's letter cites his lack of compliance with the District curriculum. *Id.* Mr. Cole has been excluded from the curriculum committee because of this dispute.[9] (PSMF ¶ 120).

---

8. In fairness to Dr. Johnson, he denies making the statements Mr. Cole attributes to him. (DRSMF ¶¶ 85–88).

9. In his Memorandum, Mr. Cole claims additional instances of "discriminatory and unfa-

vorable treatment." Pl.'s Mem. In Opp. To Def.'s Mot. for Sum. Jud. at 7–8. He states that Principal Graves told him, "I have been watching you;" that until recently, he had been required to teach extra classes; that he has been given more duties than any other

## II. DISCUSSION

### A. Legal Standard.

■ Summary judgment's role is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992). Summary judgment may be granted only if the record demonstrates that there is "no genuine issue as to any material fact and that the moving party in entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Material" means that a contested fact has "the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the non-movant." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995). "Genuine" means that the "evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Id.*

■ The burden rests on the movant and consists of "two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and, an ultimate burden of persuasion, which always remains on the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party has satisfied its initial burden, the nonmovant must produce "specific facts, in suitable evidentiary form, to ... establish the presence of a trialworthy issue." *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir.1994). The Court is required to "review the record

and ask if a fact finder could rationally reach a different conclusion from that of the court." *Nicolo v. Philip Morris, Inc.*, 201 F.3d 29, 33 (1st Cir.2000).

### B. The Cause of Action.

In *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), the Supreme Court recognized the conflict inherent in judicial oversight of the public school system. The Court instructed the courts not to "intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Id.* at 105, 89 S.Ct. 266. In the very next sentence, however, the Court reminded the judiciary that "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Id.* (quoting *Shelton v. Tucker*, 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960)).

■ A school district has the undoubted right to determine school curriculum and control the in-class pedagogical methods of its teachers. *Conward v. Cambridge School Comm.*, 171 F.3d 12, 23 (1st Cir.1999); *Ward v. Hickey*, 996 F.2d 448, 452–53 (1st Cir.1993). School officials have broad discretion to restrict school speech in order to further educational goals. *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 683–86, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986); *Conward*, 171 F.3d at 23; *Ward*, 996 F.2d at 452. This discretion includes "the right to design curricula and select textbooks." *Conward*, 171 F.3d at 23. It is based on "the State's power to

teacher, and, that he has been harassed and placed under constant pressure. None of these claims is grounded·on a record reference. The Court has scoured the Statements of Material Fact. It could find no reference to the Graves statement, to assignment of more duties, or to his being harassed and placed

under constant pressure. The allusion to extra work appears in Plaintiff's objection to Defendant's SMF # 45, but not in his SMF. The Court has disregarded factual assertions in Plaintiff's brief, which draw no support from his Statement of Material Facts.

prescribe a curriculum for institutions which it supports." *Meyer v. Nebraska,* 262 U.S. 390, 402, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). In *Milliken v. Bradley,* 418 U.S. 717, 741, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), Chief Justice Burger wrote: "No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process."

◼ Against this right, however, is another right: the "transcendent imperatives of the First Amendment" *Bd. of Educ. v. Pico,* 457 U.S. 853, 864, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982). The First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). It "does not permit the state to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma."[10] *Epperson,* 393 U.S. at 106, 89 S.Ct. 266; *see also Grendel's Den, Inc. v. Goodwin,* 662 F.2d 102, 104 n. 4 (1st Cir.1981) (Coffin, J.). The courts recognize that public school students are particularly vulnerable to the inculcation of orthodoxy in the guise of pedagogy: "In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate... (school) officials cannot suppress 'expressions of feeling with which they do not wish to contend.' " *Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 511, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) quoting *Burnside v. Byars,* 363

F.2d 744, 749 (5th Cir.1966). The State has "no legitimate interest in protecting any or all religions from views distasteful to them..." *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 505, 72 S.Ct. 777, 96 L.Ed. 1098 (1952).

◼ How are the courts to resolve the right of local school boards to control curriculum and teaching against the right of teachers and students to an education free of state mandated parochialism? The Supreme Court has stated the test: "What are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution." *Epperson,* 393 U.S. at 107, 89 S.Ct. 266 (quoting *Abington Sch. Dist. v. Schempp,* 374 U.S. 203, 222, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963)).

◼ These are not questions this Court can answer at this stage in the proceedings. The "substantive question before (the Court) is...constrained by the procedure posture of this case." *Pico,* 457 U.S. at 862–63 102 S.Ct. 2799 (addressing the constraint imposed by a motion for summary judgment). Relying in part upon the chronology of events, Mr. Cole draws a straight line of causation from his first encounter with Ms. Olsen in early September, 1997, her immediate complaints to the school, her sister's complaints, and the alleged responses of the District beginning on September 15, 1997, culminating in the curtailment of his teaching the history of non-Christian religions in his seventh grade class. To buttress his position, he

---

**10.** Count I of Mr. Cole's Complaint asserts a violation of his First Amendment Free Speech rights; Count II claims a violation of the Establishment Clause. These claims would ordinarily require separate analyses. However, here, Mr. Cole claims the same acts that inhibited his First Amendment right to freedom of expression established a religious orthodoxy at Skyway Middle School. The Court concludes Mr. Cole has raised genuine issues of material fact under both Counts.

posits a damaging admission from the School Superintendent, acknowledging the District is "run" by members of the State Road Advent Christian Church. Based on Mr. Cole's allegations, this Court concludes he has raised genuine issues of material fact as to whether the District's curriculum restrictions were motivated by the desire to eliminate references in seventh grade classes to non-Christian religions and to include references only to Christian religions. Mr. Cole has presented evidence, which if believed, would allow the conclusion the District's actions violated the First Amendment.[11]

### C. The Remedy.

In Counts I and II, Mr. Cole requests injunctive relief. Count III, however, requests compensatory damages for alleged retaliation by the District for his assertion of First Amendment rights. Here, he nearly stumbles.

### 1. The Law.

 To establish a 42 U.S.C. § 1983 claim, an employee must demonstrate there has been an "adverse employment action."[12] The First Circuit assisted this analysis with a general definition: "Typically, the employer must either (1) take something of consequence from the employee, say by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities, (citation omitted) or (2) withhold from the employee an accouterment of the employment re-

lationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service." *Blackie v. Maine*, 75 F.3d 716, 725 (1st Cir.1996) (FSLA retaliation claim). The First Circuit has cautioned, however, that the "standard for showing an adverse employment action is lower in the First Amendment retaliation context than it is in other contexts (such as Title VII) (citation omitted) and the Supreme Court has indicated that even relatively minor events might give rise to liability." *Rivera–Jimenez v. Pierluisi*, 362 F.3d 87, 94 (1st Cir. 2004).

Case law illuminates the proper application of the concept of adverse action in the First Amendment context. The Supreme Court has recognized that "freedoms of expression in general ... are vulnerable to gravely damaging yet barely visible encroachments." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). The mere threat of the imposition of a sanction can be sufficient "to present infringement to justify redress." *Muller v. Conlisk*, 429 F.2d 901, 903 (7th Cir.1970). Thus, in *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 75, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), the Supreme Court clarified that in the First Amendment context need not be the "substantial equivalent of a dismissal" and can include such employment actions as "promotions, transfers, and recalls after layoffs." In *Elrod v. Burns*, 427 U.S. 347,

---

**11.** This conclusion should not be misinterpreted as imposing the Court's imprimatur on Mr. Cole's version of the events. The District has posited a sequence of events that would compel precisely the opposite conclusion.

**12.** "Adverse employment action" may be a misnomer in a § 1983 First Amendment context. The Seventh Circuit pointed out § 1983 does not itself require an "adverse employment action," as found for example in Title

VII. *Power v. Summers*, 226 F.3d 815, 820 (7th Cir.2000). Section 1983 is not limited to employment. *Power* suggested the test is whether the "deprivation under color of law...is likely to deter the exercise of free speech..." *Id.* As *Rivera–Jimenez* explained, regardless which term is used, the standard is lower in a § 1983 First Amendment case. *Rivera–Jimenez v. Pierluisi*, 362 F.3d 87, 94 (1st Cir.2004).

359, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), Justice Brennan in a plurality opinion extended the range of adverse actions: "the threat of dismissal...unquestionably inhibits protected belief...." *But see Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (damage to reputation not actionable under § 1983 and Due Process Clause). Consistent with this authority, in *Rivera–Jimenez,* the First Circuit concluded that internal investigation and dismissal for engaging in protected speech made out a case of adverse employment action. *Rivera–Jimenez,* 362 F.3d at 94.

In *Ray v. Henderson,* 217 F.3d 1234, 1243 (9th Cir.2000), the Ninth Circuit adopted a "reasonably likely to deter" test: "an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." *Accord Coszalter v. City of Salem,* 320 F.3d 968 (9th Cir.2003); *Moore v. California Inst. Of Tech. Jet Propulsion Lab.,* 275 F.3d 838, 847–48 (9th Cir.2002). More specifically, the Ninth Circuit found an employee who had been "reassigned to another position, and otherwise harassed in retaliation for...remarks he made to the press" had made a sufficient allegation of adverse action to form the basis of a First Amendment claim. *Allen v. Scribner,* 812 F.2d 426, 428 (9th Cir.1987); *see also Lytle v. Carl,* 382 F.3d 978, 987 (9th Cir.2004) (Assistant Superintendent's investigation of sick day request and denial of sick leave is sufficient); *Thomas v. Carpenter,* 881 F.2d 828, 832 (9th Cir.1989) (Employer removing certain responsibilities from plaintiff's usual job assignments is sufficient.) The Ninth Circuit adverse action limitation may be found in *Nunez v. City of Los Angeles,* 147 F.3d 867, 875 (9th Cir.1998) (Plaintiff's claim not sufficient when "all he has shown is that he was bad-mouthed and verbally threatened.").[13]

In *Power,* 226 F.3d at 821, a case cited in *Rivera–Jimenez,* the Seventh Circuit concluded the denial of a raise of several hundred dollars was sufficient to state a § 1983 First Amendment claim for retaliation. ("a tenure system does not select for boldness"). More directly applicable is the Seventh Circuit case of *Yoggerst v. Stewart,* 623 F.2d 35 (7th Cir.1980), where oral and written reprimands raised a genuine issue of material fact on the question of impairment or infringement in a § 1983 First Amendment case.[14] *See also Smith v. Fruin,* 28 F.3d 646, 649 (7th Cir. 1994)("...even minor forms of retaliation can support a First Amendment claim, for they may have just as much of a chilling effect on speech as more drastic measures."); *Kreilkamp v. City of Watertown,* 2000 WL 34228195, *18 (W.D.Wis.2000); *but see Walsh v. Ward,* 991 F.2d 1344, 1347 (7th Cir.1993)("...even today, one can not say with confidence how far judges must supervise the employment relation in order to root out all reactions to employees' speech").

On the other hand, the Fifth Circuit imposes a higher standard. In *Breaux v. City of Garland,* it held in the education context that " 'decisions concerning teaching assignments, pay increases, administrative matters, and departmental procedures' while extremely important to the person who dedicated his or her life to

---

**13.** The Ninth Circuit discussed *Nunez* in *Coszalter* and limited it to "only minor acts, such as 'bad-mouthing' ". *Coszalter,* 320 F.3d at 975–76.

**14.** In *Yoggerst,* the Seventh Circuit wrote: "It may be that further proceedings will disclose that the infringement here has been so minimal that any damages are nominal. But this does not lead us to the conclusion that there is no genuine issue of material fact on the question of impairment or infringement." *Yoggerst,* 623 F.2d at 39.

teaching, do not rise to the level of a constitutional deprivation." 205 F.3d 150, 157 (5th Cir.2000) quoting *Dorsett v. Board of Trustees for State Colleges & Universities*, 940 F.2d 121, 123–24 (5th Cir.1991) (restriction on teaching assignments, pay increases, administrative matters, and departmental procedures are a matter of private not public concern and, therefore, did not state a First Amendment claim); *see also Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir.1997).

## 2. The Facts.

Mr. Cole claims he has suffered the following adverse employment actions:

1) given negative evaluations;

2) subjected to close scrutiny by his principal, Mr. Graves;

3) issued a letter of reprimand;

4) additional teaching duties imposed;

5) inability to attend team planning meetings due to increased teaching duties;

6) required to be evaluated by a psychiatrist;

7) a violation of his rights under the labor contract;

8) launching of investigations about him without his knowledge;

9) placement of material in his personnel file without his knowledge;

10) exclusion from the Curriculum Committee; and,

11) informed he may be fired.

*Pl.'s Mem. of Law In Opposition to Def.'s Mot. for Summ. Judg.* at 19.

## 3. Conclusion: Remedy.

It is unnecessary to engage in the onerous task of isolating which items on this list of allegations are properly before the Court.[15] Viewing the facts in a light most favorable to Mr. Cole, it was due to teaching non-Christian history that he received a letter of reprimand from the Principal and a letter threatening termination from the District's lawyer. The letter of reprimand threatens "further disciplinary action" and the District's attorney's letter threatens termination in part for "lack of adherence to the District curriculum." The latter letter fits within Justice Brennan's "threat of dismissal" language. *Elrod*, 427 U.S. at 359, 96 S.Ct. 2673. Together the letters are sufficient to withstand summary judgment under the "reasonably likely to deter" Ninth Circuit test. *Ray*, 217 F.3d at 1243. They would also pass in the Seventh Circuit. *Glass v. Dachel*, 2 F.3d 733, 741 (7th Cir.1993) ("If a reprimand letter addresses constitutionally protected speech, the plaintiff can establish an infringement of constitutional rights because of its deterrent effect."); *Yoggerst*, 623 F.2d at 39. They would, however, likely be insufficient in the Fifth Circuit.

---

15. Mr. Cole's list of adverse actions contains no record citations. *Pl.'s Mem. In Opp. to Def's Mot. for Summ. Judg.* at 19; *see also footnote 9.* The Court searched the recitation of facts in his memorandum to determine whether record citations otherwise appear. Mr. Cole's references to the Principal's letter dated January 11, 2001; the District's lawyer's letter dated June 2, 2004 to his then counsel; and his exclusion from the Curriculum Committee all appear elsewhere in his Memorandum with record citations. The Court was unable to find any record citations to his remaining allegations.

Citing Interrogatory Answer 4 in his denial of Defendant's SMF ¶ 45, Mr. Cole referred to "additional teaching responsibilities," to his inability to attend team meetings, to the psychiatric evaluation, to the violation of his contractual rights, to the launching of investigations, and to the placement of material in his personnel file. His Statements of Material Fact make no separate references to additional duties, his inability to attend meetings, the psychiatric examination, or the investigations. The Court could locate no evidence sustaining these allegations.

■ Although it is unclear precisely which formulation the First Circuit would adopt, the First Circuit included "unwarranted negative job evaluations" as one of the "material changes" constituting adverse employment action in Title VII actions.[16] *Gu v. Boston Police Dep't,* 312 F.3d 6, 14 (1st Cir.2002) (quoting *Hernandez–Torres v. Intercontinental Trading, Inc.,* 158 F.3d 43, 47 (1st Cir.1998)); *see also Wyatt v. City of Boston,* 35 F.3d 13, 15–16 (1st Cir.1994). If "unwarranted negative job evaluations" were sufficient under the Title VII actions in *Gu, Hernandez–Torres,* and *Wyatt,* the two District letters would appear pass muster under the lower standard for § 1983 First Amendment cases. Mr. Cole has created a genuine issue of material fact as to whether the two District letters were intended to chill Mr. Cole's exercise of First Amendment rights and established of a "pall of orthodoxy" over his classroom, meeting the adverse action requirement.[17]

## III. CONCLUSION

Maine School Administrative District No. 1 has failed to sustain its burden to demonstrate there are no genuine issues of material fact and its Motion for Summary Judgment is DENIED.

## SO ORDERED.

---

16. In *Rivera–Jimenez,* the First Circuit confirmed the standard for adverse action is lower in the First Amendment context; however, further clarification of the standard was unnecessary for resolution of the appeal. 362 F.3d at 94. In *Rivera Jimenez,* the First Circuit cited Ninth, Seventh, and Fifth Circuit authority without suggesting its preference. *Id.*

17. To anticipate the parties' concern about the preclusive effect of this Order, in determining there is a genuine issue of material fact regarding these two letters, the Court has not precluded Mr. Cole from presenting evidence at trial of the other alleged adverse actions. As noted, he failed properly to present the remaining evidence during this motion, but this does not mean he cannot attempt to do so at trial.